# STATE OF MARYLAND *v.* FABRITZ

[No. 29, September Term, 1975.]

*Decided December 3, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Warren F. Sengstack, State's Attorney for Calvert County,* on the brief, for appellant.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Richard J. Clark, District Public Defender,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court. O'DONNELL, J., dissents and filed a dissenting opinion at page 426 *infra.*

Maryland Code (1971 Repl. Vol., 1975 Cum. Supp.), Art. 27, § 35A (a) provides that any parent or other person having

custody of a child under eighteen years of age "who causes abuse to such minor child" shall be guilty of a felony. The statute defines the term "abuse" in subsection (b)7 to mean:

"any physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts . . . ."

Virginia Lynnette Fabritz (Virginia) was charged with violating this statute by abusing her three-and-one-half-year-old daughter Windy. Evidence adduced at the trial before a jury in the Circuit Court for Calvert County showed that Windy was brought to the Calvert County Hospital at 10:35 p.m. on October 3, 1973 in a badly beaten condition with approximately seventy bruises or contusions covering her body, ranging in size from one inch to five inches. She was pronounced dead on arrival at the hospital, her death being attributed to peritonitis resulting from a perforated or ruptured duodenum. The evidence showed that Windy's injuries were the result of "blunt trauma" caused by an instrument, or a fist, or some kind of blow inflicted within eighteen to twenty-four hours prior to her death.

Virginia had left Windy in the custody of Thomas Crockett and his wife Ann, with whom she resided, on October 1. Virginia did not see Windy again until 1 p.m. on October 3, at which time she noticed that Windy was very listless. Crockett told her that Windy had driven with him on his motorcycle and had gotten sick as a result of a bumpy ride. At 2:30 p.m. Windy complained of cramps and was running a slight fever; Virginia attributed this to the flu. She then bathed Windy and, after observing her badly beaten body, put her to bed and spent the remainder of the afternoon watching Crockett work on his motorcycle. At 5 p.m. Virginia observed that Windy appeared to be in a semiconscious state, but she did not take her to the hospital because she "was too ashamed of the bruises on her daughter's body." There was evidence that Windy thereafter sat up and appeared normal for a brief period, but at 6 p.m. she vomited and again complained that she did not feel well.

At 7 p.m. Virginia put Windy back to bed and called a friend, Connie Schaeffer, and asked that she look at Windy. Miss Schaeffer arrived at 9 p.m. Windy was lying on the floor of the den, covered by a wet diaper. She was limp and appeared unconscious. When Miss Schaeffer questioned Virginia about the bruises on Windy's body, Virginia responded, "Tommy [Crockett] hits hard." Windy's condition worsened and at 9:45 p.m. Ann Crockett contacted the hospital. She was advised to bring Windy to the hospital immediately. After Mrs. Crockett left for the hospital with Windy, Virginia told Miss Schaeffer, "It is my fault. I killed her." Shortly thereafter, Virginia went to the hospital and learned that Windy was dead.

Expert medical evidence was adduced to show that a child with peritonitis would vigorously complain once she sustained the injury and would continue to complain until the onset of a coma; that at the time the injuries were sustained, there would have been immediate pain and the child would have begun to feel poorly; that the pain would have gradually increased, followed by fever, vomiting, and lack of appetite; that within six hours prior to death, the child would have become stuporous and comatose; that Windy would have lived had an operation been performed within at least twelve hours prior to death; and that she would have had a chance to survive if surgery had been performed up to an hour before death. A pathologist testified that it was his medical opinion, based upon the degree of injury, the multiplicity of wounds and his examination of Windy's body, that the injuries did not happen accidentally. There was no evidence indicating that Virginia struck the blows which caused the initial injuries to her child, nor was there any evidence to show that Virginia had knowledge that the person in whose custody she left Windy would abuse her.

The trial court instructed the jury that a parent is under an affirmative duty to provide reasonable medical necessities to his child and would be guilty of child abuse under the statute if the treatment afforded to the child was "cruel or inhumane and it results in physical injury"; that

the "physical injury may be death itself"; and that "the unattended worsening of obvious serious medical condition if cruel or inhumane and if more serious consequences result, is in itself . . . a physical injury within the meaning of the terms as they are used in the Statute." The jury found Virginia guilty of the offense and she was sentenced to five years' imprisonment.

The Court of Special Appeals reversed the judgment of conviction, holding that "to be guilty under the statute, the accused must be shown to have caused the injury, not simply aggravated it by failure to seek assistance." *Fabritz v. State,* 24 Md. App. 708 at 714, 332 A. 2d 324 at 327 (1975). In so concluding, the court said that there was nothing in the statute indicating that it was the legislative intent to encompass within its provisions parents who withhold the necessities of life, including medical care, from their children. We granted certiorari to consider whether the Court of Special Appeals properly interpreted the child abuse statute.

The State contends that Virginia's failure to provide medical care to Windy in the circumstances of this case amounted to child abuse within the meaning of the statute. More specifically, the State urges that the evidence showed that Windy was the victim of a medical condition known as the "battered child syndrome"; that the beating Windy suffered caused peritonitis which resulted "in a gradual and continuous general deterioration of the child's health and well-being culminating in her death"; that although there was no evidence that Virginia was the individual who beat Windy, she was "fully aware of her child's beaten condition . . . [but] failed for a period of several hours to seek medical attention for her child and . . . her inaction amounted to child abuse"; and that while there was no evidence that Windy's injuries resulted from any "malicious act" perpetrated by Virginia, her failure to obtain medical attention for her daughter constituted, within the sense contemplated by the statute, "cruel or inhumane treatment" and was a contributing cause of the "physical injury" which the child sustained.

On Virginia's behalf it is argued that to be guilty of child abuse under § 35A, a person must have "caused" the child to suffer physical injury as a result of cruel or inhumane treatment. Virginia claims that § 35A "concerns injuries as a result of the treatment or acts of the accused" and that because Windy was injured and died as a consequence of blows inflicted by someone other than herself, her failure to obtain medical aid for Windy was not the cause of the child's injuries or death. Virginia maintains that the gist of the statutory offense of child abuse is not cruel or inhumane treatment but rather the infliction of physical injuries upon a child as a result of such treatment.

The cardinal rule in the construction of statutes is to effectuate the real and actual intention of the Legislature. *Purifoy v. Merc.-Safe Dep. & Trust,* 273 Md. 58, 327 A. 2d 483 (1974); *Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 306 A. 2d 534 (1973); *Height v. State,* 225 Md. 251, 170 A. 2d 212 (1961). Equally well settled is the principle that statutes are to be construed reasonably with reference to the purpose to be accomplished, *Walker v. Montgomery County,* 244 Md. 98, 223 A. 2d 181 (1966), and in light of the evils or mischief sought to be remedied, *Mitchell v. State,* 115 Md. 360, 80 A. 2d 1020 (1911); in other words, every statutory enactment must be "considered in its entirety, and in the context of the purpose underlying [its] enactment," *Giant of Md. v. State's Attorney,* 267 Md. 501 at 509, 298 A. 2d 427, at 432 (1973). Of course, a statute should be construed according to the ordinary and natural import of its language, since it is the language of the statute which constitutes the primary source for determining the legislative intent. *Grosvenor v. Supervisor of Assess.,* 271 Md. 232, 315 A. 2d 758 (1974); *Height v. State, supra.* Where there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intention of the Legislature. *Purifoy v. Merc.-Safe Deposit & Trust, supra.* Thus, where statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with a view towards making the statute express an

intention which is different from its plain meaning. *Gatewood v. State*, 244 Md. 609, 224 A. 2d 677 (1966). On the other hand, as stated in *Maguire v. State*, 192 Md. 615, 623, 65 A. 2d 299, 302 (1949), "[a]dherence to the meaning of words does not require or permit isolation of words from their context '* * * [since] the meaning of the plainest words in a statute may be controlled by the context. . . .' " In construing statutes, therefore, results that are unreasonable, illogical or inconsistent with common sense should be avoided whenever possible consistent with the statutory language, with the real legislative intention prevailing over the intention indicated by the literal meaning. *B. F. Saul Co. v. West End Park*, 250 Md. 707, 246 A. 2d 591 (1968); *Sanza v. Md. Board of Censors*, 245 Md. 319, 226 A. 2d 317 (1967); *Height v. State, supra.*

It is, of course, well settled that penal statutes must be strictly construed, *State v. Fleming*, 173 Md. 192, 195 A. 392 (1937), "by which is meant that courts will not extend the punishment to cases not plainly within the language used," *State v. Archer*, 73 Md. 44, 57, 20 A. 172, 172 (1890). But as our predecessors noted in *Healy v. State*, 115 Md. 377, 379, 80 A. 1074, 1075, it is the intention of the Legislature that governs in the construction of all statutes so that penal statutes, like other statutes, are to be fairly and reasonably construed and courts should not, by narrow and strained construction, exclude from their operation cases plainly within their scope and meaning. In the final analysis, in construing any statute requiring construction, courts must consider not only the literal or usual meaning of words, but their meaning and effect in light of the setting, the objectives and purposes of the enactment, with the real intention prevailing over the literal intention even though such a construction may seem to be contrary to the letter of the statute. *Criminal Ins. Comp. Bd. v. Gould*, 273 Md. 486, 331 A. 2d 55 (1975); *Barnes v. State*, 186 Md. 287, 47 A. 2d 50 (1946); *Height v. State, supra.*

It is in light of these principles of construction of statutes that we consider the provisions of § 35A as they stood at the time of the alleged offense. Codified under the subtitle

"Child Abuse," the statute's declared legislative purpose is "the protection of children who have been the subject of abuse. . . ." As heretofore indicated, the statute defines "abuse" to encompass "any physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts." Under the statute, any person having custody of a child under eighteen years of age who "causes" such abuse is guilty of a felony. The precursor to § 35A was chapter 743 of the Acts of 1963, which was originally codified as Code (1957) Article 27, § 11A and included under the subtitle "Assault on Children"; that statute, which was recodified as Article 27, § 35A by chapter 500 of the Acts of 1970, provided that any person having custody of a minor child under fourteen years of age "who maliciously beats, strikes or otherwise mistreats such minor child to such degree as to require medical treatment" would be guilty of a felony. It would appear from its terms that that enactment was not intended to reach acts of individuals not constituting, in one form or another, an assault on a child. It was not until § 35A was amended by chapter 835 of the Acts of 1973 that the Legislature repealed the "maliciously beats, strikes, or otherwise mistreats" test of child abuse, and substituted in its place a new and different measure of the offense — one defined by new subsection (b) 7 in terms of physical injuries caused by "cruel or inhumane treatment or as a result of malicious act or acts." According to its title, one of the purposes underlying the 1973 amendment of § 35A was "generally extend[ing] the law of child abuse." Considering the particular use and association of words and definitions used in § 35A, we think a doubt or ambiguity exists as to the exact reach of the statute's provisions, justifying application of the principle that permits courts in such circumstances to ascertain and give effect to the real intention of the Legislature. *See Clerk v. Chesapeake Beach Park*, 251 Md. 657, 248 A. 2d 479 (1968); *Domain v. Bosley*, 242 Md. 1, 217 A. 2d 555 (1966).

We think it evident that the Legislature, by its 1973 amendment to § 35A, plainly intended to broaden the area of

proscribed conduct punishable in child abuse cases. Its use in the amended version of § 35A of the comprehensive phraseology "who causes abuse to" a minor child, coupled with its broad two-pronged definition of the term "abuse," supports the view that the Legislature, by repealing the narrow measure of criminality in child abuse cases then provided in § 35A, and redefinining the offense, undertook to effect a significant change of substance in the scope of the statute's prohibitions. In making it an offense for a person having custody of a minor child to "cause" the child to suffer a "physical injury," the Legislature did not require that the injury result from a physical assault upon the child or from any physical force initially applied by the accused individual; it provided instead, in a more encompassing manner, that the offense was committed if physical injury to the child resulted either from a course of conduct constituting "cruel or inhumane treatment" or by "malicious act or acts."

As defined in Black's Law Dictionary 966 (3rd ed. 1933), an injury is "[a]ny wrong or damage done to another . . ."; the term is defined in Webster's Third New International Dictionary 1164 (1961) as "an act that damages, harms, or hurts: an unjust or undeserved infliction of suffering or harm." Of course, the injury would be a physical one if it relates to or pertains to the body. To be a "cause" of physical injury to another, a person would in some manner have to be accountable for the "condition that brings about an effect or that produces or calls forth a resultant action or state." Webster's Third New International Dictionary 356. Affording the term "physical injury" the broad meaning that the context of § 35A would seem to mandate, we think a parent would be criminally responsible as having "caused" such a physical injury to his child in the sense contemplated by the statute if, as a result of the parent's "cruel or inhumane treatment," the child suffered bodily harm additional to that initially sustained as a consequence of the injury originally inflicted upon him. *Cf. Palmer v. State,* 223 Md. 341, 164 A. 2d 467 (1960) where in affirming an involuntary manslaughter conviction of a mother who

knowingly permitted her infant child to be subjected to prolonged beatings by her paramour, we concluded that although the direct and immediate cause of the child's death was attributable to blows struck by the mother's paramour, her failure to remove the child from the paramour's presence constituted gross and criminal negligence and "was a contributing cause of . . . [the child's] unfortunate death." 223 Md. at 353.

Whether, in view of the evidence adduced at the trial, Virginia's failure to obtain medical assistance for Windy constituted cruel or inhumane treatment resulting in physical injury to the child is, of course, the crux of this appeal. That a parent under Maryland law is legally obligated to provide necessary medical care to his child is clear. Code (1970 Repl. Vol.) Art. 72A, § 1; *Craig v. State*, 220 Md. 590, 155 A. 2d 684 (1959); *Baltimore City v. Fire Insurance Salvage Corporation*, 219 Md. 75, 148 A. 2d 444 (1959). That Virginia knew of Windy's severely beaten condition is manifest from the evidence; indeed, as the photographic exhibits in the case so painfully demonstrate, Windy bore the multiple bruises of a vicious assault, of which Virginia was aware at least as early as 2:30 p.m. on October 3, 1973. Between that hour, and 10:35 p.m. when Windy died, Virginia failed to seek or obtain any medical assistance although, as the evidence heretofore outlined so plainly indicates, the need therefor was obviously compelling and urgent. There was evidence that Virginia's failure to seek such assistance was based upon her realization that the bruises covering Windy's body would become known were the child examined or treated by a physician. Other evidence in the case all too graphically illustrated the suffering to which Windy was subjected by Virginia's failure to provide the treatment needed to save the child's life. We think the jury properly could have concluded from the evidence that, as a result of Virginia's conduct, Windy's condition was permitted to steadily deteriorate until the child's ordeal was ended by death; that Virginia's failure to act caused Windy to sustain bodily injury additional to and beyond that inflicted upon her by

reason of the original assault and constituted a cause of the further progression and worsening of the injuries which led to Windy's death; and that in these circumstances Virginia's treatment of Windy was "cruel or inhumane" within the meaning of the statute and as those terms are commonly understood. Accordingly, we conclude that the Court of Special Appeals was in error in its interpretation of § 35A and in its reversal of Virginia's conviction.

> *Judgment of the Court of Special Appeals reversing the judgment of the Circuit Court for Calvert County vacated; case remanded to the Court of Special Appeals for consideration of the other issues presented to that court on appeal, but not decided; costs to abide the result.*

*O'Donnell, J., dissenting:*

Although I agree that the conduct of the 20-year old mother, Virginia Fabritz, toward her three-and-one-half-year-old daughter, was reprehensible, and that as a result of her attempt to treat the child with "home remedies," and her failure to more promptly seek medical attention, "Windy's condition was permitted to steadily deteriorate until the child's ordeal was ended by death," I cannot concur with the majority in finding her conduct to be within the proscription of Maryland Code (1957, 1971 Repl. Vol. [1975 Cum. Supp.]) Art. 27, § 35A (a). I would affirm the judgment of the Court of Special Appeals in *Fabritz v. State*, 24 Md. App. 708, 332 A. 2d 324 (1975).

I fear that my distinguished colleagues may have been swayed by the photographic exhibits, which they describe as "painfully demonstrating" the multiple bruises Windy bore as a result of a "vicious assault," and which they find "too graphically illustrated the suffering to which Windy was subjected by Virginia's failure to provide the treatment

needed to save the child's life." It is a case such as this as brings forth the cogent observation of Wolfe, B., in *Winterbottom v. Wright,* 10 M. & W. 116 (1842) where he noted "hard cases, it has been frequently observed, are apt to introduce bad law." [1]

Art. 72, § 1 of the Code (1957, 1970 Repl. Vol. [1975 Cum. Supp.]) places upon a parent the duty to provide "support, care, nurture, welfare and education," for a child under eighteen years of age. Pursuant to this section, it is incumbent upon a parent to provide medical attention, when necessary, to a minor child, although the statute itself does not in specific terms mention "medical care."

The unintentional killing of another by the omission, through gross negligence, to perform a legal duty owing to him, was involuntary manslaughter at common law. *See* Clark & Marshall, *"Law of Crimes,"* § 10.12 (6th ed. 1958). *See also* R. Perkins, *"Criminal Law,"* Ch. 2, § 1 (1969), at pp. 71-73. This principle has been well recognized in this state in both *Palmer v. State,* 223 Md. 341, 164 A. 2d 467 (1960), and *Craig v. State,* 220 Md. 590, 155 A. 2d 684 (1959).

In *Craig,* Judge Prescott, writing for our predecessors, stated:

> "[I]t is almost universally recognized that where the defendant owed to a deceased person a specific legal duty, but failed to perform the same, and death resulted to the deceased because of the non-performance of the duty, (at least under circumstances where the failure to perform constituted gross and wanton negligence) the defendant is guilty of involuntary manslaughter. 1 *Warren, Homicide,* Sec. 122, states the principle rather succinctly, as follows:
>
> > 'Where the defendant owed the deceased a legal or contractual duty, any omission of the duty

---

1. See also the observations of Holmes, J. in Northern Securities Co. v. United States, 193 U. S. 197, 400 (1904), that "great cases, like hard cases, make bad law. . . ."

resulting in the death of the deceased renders the defendant chargeable with manslaughter. The duty must have been a plain one which he was bound by law or contract to perform personally. A criminal intent is not a necessary element of the offense. The breach of duty need not have been a criminal offense.

* * *

'The defendant is guilty of manslaughter where he neglected to provide his wife with necessaries or with medical attention, or an infant in his charge with medical attention; * * * ' " [citations omitted]. 220 Md. at 596, 155 A.2d at 688.

Where however "the basis of the charge be felonious negligence . . . it must [be shown to] have been gross or criminal negligence." *Neusbaum v. State*, 156 Md. 149, 162, 143 A. 872, 877 (1928); "gross or criminal negligence" has been interpreted by this Court to mean "a wanton or reckless disregard for human life." *Craig v. State, supra*, at 597, 155 A. 2d at 688, citing *Hughes v. State*, 198 Md. 424, 84 A. 2d 419 (1951); *Thomas v. State*, 206 Md. 49, 109 A. 2d 909 (1954); *Clay v. State*, 211 Md. 577, 128 A. 2d 634 (1957).

Convictions for involuntary manslaughter of a husband and wife were reversed by our predecessors in *Craig v. State, supra*. There, the parents, because of their religious beliefs, treated their six-month-old child at home, "constantly and tenderly," without medical intervention, during an illness, later diagnosed as pneumonia, which proved to be fatal. Evidence at the trial was adduced however that prompt medical attention "may" have saved the child's life. After observing that "parents are vested with a reasonable discretion in regard to when medical attention is needed for their children," the Court stated:

"If we assume that ordinarily careful and prudent parents would have called in medical aid during the initial stages of the child's illness, and, therefore,

the defendants were guilty, at this time, of ordinary negligence in failing to call in a physician, we still find nothing in the testimony that would sustain a finding that during this early period of the child's illness the parents displayed 'a wanton or reckless disregard for' the child's life; and, if we assume that the seriousness of the child's illness was easily discernible to them in the last two or three days of its life, so that their failure, at that time, to call in medical aid did constitute gross negligence, the record fails to disclose that this failure was the proximate cause of the child's death, . . . ." 220 Md. at 598, 155 A. 2d at 689.[2]

It is true that in *Palmer v. State, supra,* as the majority points out, there was no evidence that the mother of the child had inflicted any of the blows which were shown to be the direct and immediate cause of the child's death. Upon the facts, to all intents, the appellant was shown to have been a principal in the second degree, since she permitted her paramour to inflict "prolonged and brutal beatings" upon her twenty-months'-old child. Although the Court concluded that this "gross or criminal negligence" on her part was a contributing proximate cause of the child's death, our predecessors there, citing 1 Wharton, *Criminal Law and Procedure* Section 68 (Anderson Ed.), set forth the general rule that: "A person is only criminally liable for what he has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted." 223 Md. at 353, 164 A. 2d at 474.

It goes without saying, that if the appellee had been shown not to have provided her child with medical attention through "gross or criminal negligence" — with "a wanton or reckless disregard for human life" — she would be subject to prosecution for common law involuntary manslaughter. *See* 21 Md. L. Rev. 262 (1961). The majority however undertakes

---

**2.** There is a certain parallel between the facts in the instant case and those in Craig v. State, *supra;* in both cases the parents attempted, albeit unsuccessfully and negligently, to alleviate the child's suffering; in neither case were the respective parents the initial cause of the child's malady.

to engraft upon the provisions of Art. 27, § 35A (a), the statute under which the appellee was charged,[3] the elements of the common law offense of involuntary manslaughter and reaches an equivalent result by equating the phrase "cruel or inhumane treatment" with "gross or criminal negligence" and by substituting the word "injury" with the term "death."

Penal statutes, those which command or prohibit certain acts and establish penalties for their violation, must be strictly construed in favor of the accused and against the state. *Wanzer v. State*, 202 Md. 601, 611, 97 A. 2d 914, 918 (1953); *Weinecke v. State*, 188 Md. 172, 176, 52 A. 2d 73, 74 (1947). The rule requiring a strict construction of such statutes means that the punishment proscribed will not be extended to cases not plainly falling within the language of the statute. *Smith v. Higinbothom*, 187 Md. 115, 130, 48 A. 2d 754, 761 (1946); *State v. Fleming*, 173 Md. 192, 196, 195 A. 392, 393 (1937); *Healy v. State*, 115 Md. 377, 379, 80 A. 1074, 1075 (1911); *Mitchell v. State*, 115 Md. 360, 364, 80 A. 1020, 1022 (1911). It is thus fundamental that no person can be held for violating a criminal statute unless the act with which he is charged comes plainly within both the letter and the spirit of the statute under which the charge is laid. *State v. Sinclair and Sinwellan Corp.*, 274 Md. 646, 660, 337 A. 2d 703, 712 (1975); *Fowel v. State*, 206 Md. 101, 106, 110 A. 2d 524, 526 (1955).

As was stated in *Daniel Loughran Co. v. Lord Baltimore Candy and Tobacco Co.*, 178 Md. 38, 47, 12 A. 2d 201, 205 (1940) "[t]he legislature, in the exercise of its power to declare what shall constitute a crime or punishable offense, must inform the citizen with reasonable precision what acts it intends to prohibit, so that he may have a certain understandable rule of conduct and know what acts it is his duty to avoid. 14 *Am. Jur.* 773, "*Criminal Law*," sec. 19; 16 *C*.

---

**3.** The indictment charged that the appellee ". . . did unlawfully abuse, Windy Lynn Fabritz, a minor child . . . by inflicting physical injuries sustained as a result of cruel and inhumane treatment, or as a result of malicious act or acts, . . . ."

*J.* 67; *Connally v. General Construction Co.*, 269 U. S. 385, 46 S. Ct. 126, 70 L. Ed. 322."

As the majority points out, Art. 27, § 35A (a) punishes, as a felony, any parent, or other person "who causes abuse to such minor child." "Abuse" is defined in subsection (b) 7 to mean: "[A]ny . . . physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts . . . ." The statute thus punishes any person who "causes [any physical *injury or injuries* [to be] sustained by a [minor] child as a *result of cruel or inhumane treatment* or as a *result of malicious act or acts*] . . . ." (emphasis added)

The majority, despite what appears to be the clear and unambiguous meaning of "physical injury or injuries," reads into the statute that the failure of the appellee to summon proper medical attention for her minor child, which they find to have been "cruel and inhumane treatment," resulting in a worsening of the child's condition and leading ultimately to her death, constituted "physical injury."

It is axiomatic that "[w]here the statutory language is plain and free from ambiguity and so expresses a definite and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended. The courts are not at liberty to surmise the legislative intention to be contrary to the words and letters of the statute, or to insert or delete words with a view of making the statute express an intention which is different from its plain meaning." *Fowel v. State, supra,* at 105, 110 A. 2d at 526. *See also Mitchell v. State, supra,* at 365, 80 A. at 1022. As stated in *Smith v. Higinbothom, supra,* at 125, 48 A. 2d at 759, "[w]here the language is clear and free from doubt, the Court has no power to evade it by forced and unreasonable construction in order to assert its own ideas of policy or morals."

It is inconsistent "with the just and benign spirit of our law to give to a criminal statute an interpretation which can be maintained only by a keen and scholastic ingenuity, [since] [t]he meaning of the law which [might] consign a man to prison . . . should be plain and obvious, and easily

understood by an ordinary capacity." *James v. State,* 63 Md. 242, 253 (1885), where it is further stated: "[o]ur functions are limited to interpreting and enforcing the legislative will when it has been declared; and it would be very unwarrantable in us to permit any private sentiments of our own to affect the construction which we give to these statutes." 63 Md. at 254.

It seems to me to be only by a "keen and scholastic ingenuity" that the majority is able to read into the phrase "physical injury or injuries," an interpretation that this means a worsening or deterioration of a physical condition which results in death. Such a construction seems clearly contrary to the precept that "[c]ourts are not at liberty to insert or delete words with a view toward making the statute express an intention which is different from its plain meaning." *Gatewood v. State,* 244 Md. 609, 617, 224 A. 2d 677, 682 (1966); *Fowel v. State, supra,* at 105, 110 A. 2d at 526.

At no place does the legislature suggest that such a construction was intended. Prior to the amendment of the statute by Ch. 835 of the Laws of 1973, the statute penalized any person "who maliciously beats, strikes or otherwise mistreats such minor child to such degree as to require medical treatment." As the Court of Special Appeals pointed out, "the express purpose of the [1973] revision was to encourage the reporting of instances of abuse and only incidentally to rearrange and revise the language thereof." 24 Md. App. at 713, 332 A. 2d at 327. There is nothing in the Title to the Act, nor in its preamble, to justify the interpretation here reached by the majority. *See Fabritz v. State, supra,* at 714, nn. 3 and 4, 332 A. 2d at 327, nn. 4 and 5.

"Death," as defined in Webster's New International Dictionary (2d ed. 1948), is "[t]he cessation of all vital functions without capability of resuscitation; . . . [the] act or fact of dying." The statute punishes one who causes "physical injury" — not one who causes death — by conduct which is "cruel or inhumane," or by a "malicious act or acts."

Ascribing to the legislature a knowledge of the existing law as to involuntary manslaughter, applied in *Palmer v.*

*State, supra,* and in *Craig v. State, supra,* I cannot see how it could have intended, when it revised in 1973, the provisions of Art. 27, § 35A (a), as limited by the definition of "abuse" in subsection (b) 7, to supersede the common law of manslaughter, and indeed to apply a different penalty, where a parent, by criminal negligence fails to promptly provide its minor child with medical care and thus contributes to the death of the child.

The acts of the mother here, although theoretically criminally negligent were not such as to cause "physical injury" to her daughter; those injuries had already been inflicted by a third party.[4] Although her failure to more promptly seek medical aid may have contributed to the "act of dying" and have hastened the "cessation of all vital functions," such failure on her part did not *cause* any "physical injury or injuries" as those terms are well defined. The statute, clearly intending to punish acts falling outside the common law of assault, but short of manslaughter, undertook to proscribe "cruel and inhumane treatment" or "malicious act or acts" which directly result in "physical injury or injuries" to such a child. Although Virginia Fabritz' non-feasance in performing a legal duty she owed her daughter, may have subjected her to a prosecution for manslaughter, her conduct was without the language and obvious intention of the statute invoked.

I agree with the conclusion reached by the Court of Special Appeals "that to be guilty under the statute, the accused must be shown to have caused the injury, not simply [to have] aggravated it by failure to seek [medical] assistance." 24 Md. App. at 714, 332 A. 2d at 327.

Secondarily, even though I concur with the view of the majority, that an offense under the statute is committed "if physical injury to the child resulted either, from a *course of conduct* constituting 'cruel and inhumane treatment,' or by

---

**4.** The appellee was acquitted of "assault and battery," the trial court finding "no evidence in this case of any hitting or assaulting of the child by this defendant." A co-defendant, Thomas ("Tommy") Crockett, in whose custody the minor child had been, during the two-day period when she sustained her physical injuries was subsequently tried and acquitted for lack of evidence.

'malicious act or acts,'" I cannot agree that under the facts of this case, the failure of the appellee — over a period of approximately eight hours — to seek out medical attention constituted such a "course of conduct." As I read the statute, the term "cruel and inhumane," in juxtaposition with the words "malicious act or acts," implies for its application, an element of malice equivalent to an act or acts shown to be "malicious" and requires a scienter to cause the child to suffer physical injury. Since the object of the statute proscribes wanton acts causing physical injury to such a minor child, it was not within the intent of the statute to punish one for having made a poor and even negligent attempt at treatment, albeit made in good faith.

There is no evidence that the appellee's negative action in failing to more promptly obtain medical assistance imputed to her any intent to permit the child to continue to suffer or to die. When she noticed that the child was in a semi-conscious state, she fed her liquids to give her strength. Upon noticing a deterioration in her physical condition, she called upon a friend to assist her. The child was then bathed with alcohol, her temperature taken and she was dressed in pajamas. Thereafter, a volunteer fire company ambulance was called and the child was taken to the hospital. Although deficient, the treatment attempted, with obvious negligence, by the appellee was in no way intended to cause her daughter any greater suffering, or death. As in *Craig v. State, supra*, the choice made by the appellant was the wrong one; even though it may have constituted an abnegation of her parental duty and an abuse of parental discretion, such failure to seek medical care was not intended to cause, or inflict, any "physical injury."

Although facts which might establish a continuing "course of conduct of cruel and inhumane" treatment, resulting in "physical injury" to a minor child may be visualized, we do not have such evidence here. There is no suggestion in the evidence that the appellant had ever assaulted, beaten or abused the child or treated it cruelly or inhumanely. We have only the mother's failure to promptly summon medical aid, coupled with expert testimony that with

surgical intervention — as much as an hour before death — the child "would have had a chance to live." The appellee's negative conduct in this regard, without any showing of malice or scienter, did not constitute "cruel and inhumane treatment" as contemplated within the terms of the statute.

I would reverse the judgment of the Circuit Court for Calvert County.