VIRGINIA LYNNETTE FABRITZ *v.*
STATE OF MARYLAND

[No. 500 (On Remand), September Term, 1974.]

*Decided January 28, 1976.*

The cause was before MORTON, LOWE and MELVIN, JJ., without any further briefing or further argument being required.

LOWE, J., delivered the opinion of the Court.

The facts surrounding the conviction of Virginia Lynette Fabritz for child abuse, by a jury of the Circuit Court for Calvert County, are detailed in our reports, *Fabritz v. State*, 24 Md. App. 708, and in those of the Court of Appeals, *State v. Fabritz*, 276 Md. 416. Suffice to say that her conviction and sentence to 5 years imprisonment were founded upon facts showing that Mrs. Fabritz had neglected to "seek or obtain any medical assistance" for her daughter for a period of eight hours after she should have known, as the Court of Appeals viewed the evidence, that the need therefor was compelling and urgent. 276 Md. 416 at 425.

Our opinion of the intent of the Legislature in enacting the child abuse statute was that an accused must be shown to have *caused* the injury to be guilty of child abuse, "not simply aggravated it by failure to seek assistance." 24 Md. App. 714. The Court of Appeals disagreed. It held that " . . . a parent would be criminally responsible as having 'caused' such a physical injury to his child in the sense contemplated by the statute if, as a result of the parent's 'cruel or

inhumane treatment,' the child suffered bodily harm additional to that initially sustained as a consequence of the injury originally inflicted upon him." 276 Md. at 424. What was meant by cruel and inhumane treatment within the meaning of the statute was "as those terms are commonly understood." In the case at bar, the jury below "commonly understood" the terms to mean the failure of a parent to seek or obtain medical assistance for her daughter for eight hours after she had reason to know the daughter had been injured. The Court of Appeals held that the evidence was sufficient to convict under the statute as that Court interpreted it. The Court of Appeals then remanded the case to us for consideration of two other issues that had been presented upon appeal.

## Instructions

Appellant set forth two complaints regarding the instructions. The first is clearly answered by the opinion of the Court of Appeals.

Appellant complained that the trial judge erroneously instructed the jury, that if it found that Windy's death had resulted from appellant's cruel or inhumane treatment, the death could be the resulting injury contemplated in the definition of abuse in Md. Code, Art. 27, § 35A. The appellant contends there was no testimony before the jury upon which it could have made such a finding, and the court's instructions permitted the jury to speculate on the proximate cause of Windy's death. That issue was considered pointedly and implicitly answered by the Court of Appeals. After determining that the Legislature intended that withholding treatment could "cause" a physical injury if such action was cruel and inhumane, the Court proceeded to point out that the crux of the appeal was

> "[w]hether, in view of the evidence adduced at the trial, Virginia's failure to obtain medical assistance for Windy constituted cruel or inhumane treatment resulting in physical injury to the child. . . ."

4

In answering its question, the Court also answered appellant's:

"We think the jury properly could have concluded from the evidence that, as a result of Virginia's conduct, Windy's condition was permitted to steadily deteriorate until the child's ordeal was ended by death; that Virginia's failure to act caused Windy to sustain bodily injury additional to and beyond that inflicted upon her by reason of the original assault and constituted a cause of the further progression and worsening of the injuries which led to Windy's death; and that in those circumstances Virginia's treatment of Windy was 'cruel or inhumane' within the meaning of the statute and as those terms are commonly understood." 276 Md. at 425-426.

We are given less direct guidance by the Court upon appellant's other instructional complaint, but find the answer in its opinion nonetheless. At the conclusion of the court's instructions to the jury, the appellant made the following request for an additional instruction concerning the principle of gross negligence.

"Mr. Dorsey: Then we would also ask that in order for the jury to determine that the Defendant was guilty of cruel and inhuman punishment, if they accept —

Judge Bowen: Cruel and inhumane treatment.

Mr. Dorsey: Cruel and inhumane treatment, rather, assuming the Court to be correct by saying death itself would be the physical injury. I would like the Court to advise the jury that the failure to provide the medical attention must have been to constitute cruel and inhumane treatment, must be of such an aggravated nature as to shock the conscience of a reasonable amount to, *amounting to gross negligence amounting to almost a wilful act.*

Judge Bowen: We are not talking about

negligence we are talking about something that is life threatening that could produce serious bodily harm.

Mr. Dorsey: Well it didn't come across to me that way Your Honor." (Emphasis added).

Although awkwardly articulated, that request adequately preserved the issue of whether appellant was entitled to an instruction commensurate with the definition of gross or criminal negligence, *i.e.*, a "wanton and reckless disregard of human life." *Hughes v. State,* 198 Md. 424, 432.

Appellant relied on *Craig v. State,* 220 Md. 590 which is apposite factually. There, both parents of a child who died from pneumonia were convicted of involuntary manslaughter for withholding medical aid for 2 or 3 days after the seriousness of the child's illness became apparent. That their withholding of medical aid was predicated upon their religious beliefs (although indicative of an intentional denial of medical aid) was considered by the Court to be

" . . . beside the point, unless their gross and wanton negligence — ordinary negligence being insufficient — caused the child's death. We have pointed out above that parents are vested with a reasonable discretion in regard to when medical attention is needed for their children. If we assume that ordinarily careful and prudent parents would have called in medical aid during the initial stages of the child's illness, and, therefore, the defendants were guilty, at this time, of ordinary negligence in failing to call in a physician, we still find nothing in the testimony that would sustain a finding that during this early period of the child's illness the parents displayed 'a wanton or reckless disregard for' the child's life; and, if we assume that the seriousness of the child's illness was easily discernible to them in the last two or three days of its life, so that their failure, at that time, to call in medical aid did constitute gross negligence, the

record fails to disclose that this failure was the proximate cause of the child's death, because, as above noted, the doctors stated that it would then have probably been ineffective to control the disease." *Craig v. State,* 220 Md. at 598-599.

The *Craig* Court then held that the evidence was insufficient to sustain a finding that gross negligence on the part of the defendants was the proximate cause of the child's death.

The Craigs were tried for involuntary manslaughter. Criminal negligence or "conduct intentionally or wantonly disregardful of any interest of others" is a species of involuntary manslaughter. *Perkins on Criminal Law* at 70 (2d ed. 1969). Mrs. Fabritz was tried for child abuse and, as the Court of Appeals pointed out in *Fabritz,* that crime is entirely different. The jury was to determine not whether appellant's conduct was "intentionally or wantonly disregardful of any interest of others," but rather whether

" ... Virginia's treatment of Windy was 'cruel or inhumane' within the meaning of the statute and as those terms are commonly understood." 276 Md. at 426.

Although we are troubled by the breadth of that definition of "cruel and inhumane" treatment,[1] we find that Judge

---

1. As the statute is interpreted by the Court of Appeals and noted by Judge Bowen in his instructions, there is no defined line of demarcation between neglect and abuse. It is also noted that the Craig Court pointed out that "parents are vested with a reasonable discretion in regard to when medical attention is needed for their children." We are not told the standards by which a parent will be held accountable for error in the exercise of such discretion. In the absence of criteria delineating that which is parental discretion, that which is neglect, and that which amounts to abuse under the Court of Appeals' interpretation of the statute (common understanding of "cruel and inhumane"), failure to seek medical aid for one's child propitiously, may be proper parental discretion, simple neglect or culpable criminal conduct depending only upon what the jury decides. The Court of Appeals noted that Virginia knew, or should have known, of Windy's condition for a period of eight hours. We are unable to say at what point during that eight hour period Virginia was 1) exercising discretion in not seeking medical attention sooner; 2) neglectful for not having sought it sooner; and 3) guilty of "cruel and inhumane treatment" for not having sought it sooner than she did. Nor are we able to advise a trial judge what test may be recommended to a jury in their deliberation.

In pointing this out, we hasten to note that the statute was not

Bowen's instruction did not violate the standard so prescribed.[2]

## Cross-Examination

The determination of criminal culpability by the jury thus rested upon whether they found Mrs. Fabritz's delay in seeking medical attention for Windy was poor judgment, though excusable as parental discretion, *cf. Craig v. State*, 220 Md. at 597; neglect (which was not charged), or inaction amounting to what the jurors "commonly understood" to be cruel or inhumane treatment. The judge described the question in somewhat more narrow terms:

> "Somewhere and the Court is not prepared to say to you where that line is to be drawn, somewhere in the relative descending scale actions become abuse as opposed to neglect.
>
> .  .  .
>
> Whether the Defendant's conduct was actuated by malice or evil intent and whether you find it was . . . within the framework of this case, either neglect or abuse, is the question you ladies and gentlemen have to resolve."

Therefore, the most crucial testimony in the case was that of the expert medical witnesses produced by the State, one of whom was Dr. Delroy Hire, a pathologist with the State Medical Examiner's office. For reasons undisclosed, appellant submitted as to Dr. Hire's qualifications to testify as an expert pathologist.

> "Mr. Dorsey: Your Honor, I am sure the State's Attorney wants the jury to have the benefit of the background of the doctor. We do submit to his qualifications."

---

questioned on constitutional grounds and we are precluded from deciding that issue here on remand. Vuitch v. State, 10 Md. App. 389, 398.

**2.** We have appended relevant excerpts of Judge Bowen's instructions clearly illustrating their compliance with the opinion of the Court of Appeals.

Sometime later, the question concerning Dr. Hire's qualifications was again raised and the stipulation more clearly defined.

> "Mr. Sengstack: For the record Your Honor, it is my understanding that the defense counsel did stipulate that the doctor was an expert.
>
> Mr. Dorsey: Expert as to pathology, Your Honor, not to surgery."

The testimony disclosed that Dr. Hire had performed an autopsy on Windy which indicated her death had come from generalized peritonitis brought about by "blunt trauma," that is, multiple bruises about her entire body. More damaging to Mrs. Fabritz was his testimony that symptoms of distress or serious illness should have been apparent from time to time during the elapsed period between trauma and death. This testimony was designed to show that during the eight hour period that she delayed seeking medical attention, Mrs. Fabritz must have been aware of the seriousness of Windy's condition. Equally critical was the doctor's testimony that, during at least part of this eight hour period, medical attention might have saved Windy's life. Obviously, the weight given by the jury to this expert's opinion that the seriousness of Windy's physical condition would have been apparent to her mother was determinative of the result the jury reached.[3] The very issue before the jury was whether Mrs. Fabritz should have known from simple observation that her daughter was in critical and immediate need of medical aid. This was pointed out to the jury when the judge instructed:

> "Now the question of whether or not such action is called for is one of fact and that must be resolved by you ladies and gentlemen. *Critical to the resolution to that question we think and so advise you, is the extent of information or notice that the*

---

3. Dr. Baban, a general practitioner, also testified for the State concerning the physical manifestations of Windy's condition.

*person having custody of the child had of the necessity for such action.*" (Emphasis added)

On cross-examination appellant therefore sought to discredit the doctor in the eyes of the jury. One attack was based upon his lack of experience as a practitioner of medicine and in treating children of Windy's age for peritonitis. The court precluded that inquiry giving three reasons for foreclosing that line of examination.

"**Q** *How many three year old children have you treated for peritonitis?*

Mr. Sengstack: *Objection.*

Judge Bowen: *Sustained.*

Mr. Dorsey: Well Your Honor this certainly goes into — he has made certain —

Judge Bowen: Objection sustained.

**Q** *Well doctor, have you ever actively engaged in the private practice of medicine?*

Mr. Sengstack: *Objection.*

Judge Bowen: *Sustain the objection.* You admitted he was qualified.

Mr. Dorsey: Your Honor I would like to approach the bench please. I do not like to argue in front of the jury.

Judge Bowen: You may do so.

(counsel to bench)

Mr. Dorsey: Your Honor, I objected at the time it was part of his testimony and it was overruled. However, the State's Attorney has had the pathologist testify to certain objective symptoms that this child would have exhibited so many hours prior to death. I certainly think that *I have the right to* cross examine him to, at least, *attempt to refute his testimony to show he is not qualified, he has had no experience on which to base his opinion* as to certain complaints which would be exhibited

by this child so many hours prior to her death. He made an unequivocal statement to that effect.

Judge Bowen: You may cross examine him on that, but what does the variety of practice or anything, or any other type of practice have to do with that. *He obviously doesn't practice clinical medicine.*

Mr. Dorsey: *That is the point I want to bring out to the jury Your Honor. You see, not to attack his report, but to attack his opinions as to —*

Judge Bowen: You may cross examine about his opinions, but I am not going to let you embarrass him by asking about his private practices.

. . .

Q Now doctor you have really concerned yourself in your medical career with the pathology of medicine and I guess in later years you have concentrated on it.

A That is partially true. We are all doctors first and then we specialize.

Q And you specialized in pathology.

A Right.

Q And in the course of — you have actually never treated patients or —

Mr. Sengstack: Your Honor, Mr. Dorsey has been warned about this once already and the State would object. There is a proper way to ask it and an improper way. Mr. Dorsey insists on asking it the improper way.

Judge Bowen: Finish your question.

Q So doctor in the period of time that you have been engaged or graduated from law school —

A Law school?

Q I mean medical school, *in the period of time you graduated from medical school, you really have not been familiar with complaints exhibited by patients in the course of treatment.*

Mr. Sengstack: *Objection.*

Judge Bowen: *Objection sustained. He doesn't tend patients.*

Q *Doctor then you have not been engaged in the practice of medicine in which you would diagnose and treat patients?*

Mr. Sengstack: *Objection.*

Q *Or have you ever been so engaged.*

Judge Bowen: *Objection sustained."* (Emphasis added).

The judge pointed out that appellant had admitted that the doctor was qualified, that it was obvious that the doctor didn't practice "clinical medicine," and he should not be "embarrassed" by asking him about his private practice.

We do not find the judge's reasons for denying that line of cross-examination persuasive. The stipulation by appellant as to the doctor's qualifications was an admission that he was qualified to express an expert opinion, not that his qualifications were impeccable and unimpeachable. Furthermore, appellant explained that this stipulation that the doctor was qualified was limited to the speciality of pathology. Secondly, although it was "obvious" to the judge that a pathologist is not a treating physician, this fact had not been imparted to the jury and thus the appellant should not have been precluded from further examination. Finally, the judge's desire to protect the doctor from embarrassment would have been commendable had it not interfered with the rights of appellant. Citing *Alford v. United States*, 282 U. S. 687, 694, the Supreme Court in *Davis v. Alaska*, 415 U. S. 308, 320 held that the court is under no obligation "to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self-incrimination, properly invoked."

The answers appellant sought to elicit bore directly on the weight the jury should give to Dr. Hire's testimony, upon which much of the case against Mrs. Fabritz was based. The subject matter was clearly relevant. See C. McCormick,

*Evidence,* § 185 at 435 (2d ed. 1972). Dr. Hire's opinion that the outward symptoms of illness, malaise and pain must have been manifested by Windy as a result of her condition was the evidence before the jury of "the extent of information or notice" given to Mrs. Fabritz which the judge instructed was critical to the resolution of the case. Thus, the doctor's believability was crucial to the defense and

> "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." *Davis v. Alaska,* 415 U. S. 308, 316.

In *Wimpling v. State,* 171 Md. 362, 376, the Court of Appeals held that opinions of experts should not be allowed on subjects within the range of common knowledge of the average man. In so ruling, the Court emphatically held that expert opinion testimony should only be resorted to when "it clearly appears that it is essential to a full and fair presentation of the case and will aid the trier of fact in dealing with it," because such testimony is of the "very lowest order and the most unsatisfactory character." Impliedly then, it should be scrutinized carefully and subjected to rigid cross-examination to test the foundation upon which the opinion was formed. The Court quoted *Jones on Evidence,* saying:

> " 'It has been said of expert testimony: 'It is not desirable in any case where the jury can get along without it, and is only admitted from necessity, and then only when it is likely to be of some value.' 'The evidence of experts is of the very lowest order and the most unsatisfactory character.' All testimony

founded upon opinion merely is weak and uncertain, and should in every case be weighed with great caution. 'The unsatisfactory nature of such evidence is well known. . . .' " *Wimpling v. State,* 171 Md. at 376.

One way of attacking an expert opinion is to show the expert's lack of experience, thus discrediting the source of knowledge upon which he bases his opinion. By doing so, the cross-examiner affords the jury an opportunity to decide that the "expert" has feet of clay and his opinion is not to be valued.

> "We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided 'a crucial link in the proof . . . of petitioner's act.' Douglas v. Alabama, 380 U.S., at 419, 13 L.Ed.2d 934." *Davis v. Alaska,* 415 U. S. at 317.

*Davis v. Alaska, supra,* dealt with the denial of cross-examination of a witness concerning his juvenile record, but again underscored the Supreme Court's prior rulings that a denial of the right of effective cross-examination is "constitutional error of the first magnitude [which] no amount of showing of want of prejudice [can] cure. . . ." *Davis v. Alaska,* 415 U. S. at 318; *Brookhart v. Janis,* 384 U. S. 1, 3; *Smith v. Illinois,* 390 U. S. 129, 131.

### Harmless Error

The denial here was error; but, the State argues that, assuming the court improperly restricted the scope of cross-examination, "such action by the trial court was harmless error, for it is well settled that the reception or

rejection of improper evidence is not reversible error unless there is demonstrable prejudice. *Barger v. State,* 2 Md. App. 565 (1967); *Duncan v. State,* 5 Md. App. 440 (1968); *Williams v. State,* [15 Md. App. 320 (1972)]." The State points to related testimony permitted by the court arguing that it sufficed to put the doctor's experience into evidence.

We can find no basic difference between the questions permitted and the questions denied. As indicated in context above, the judge denied answers to three questions, two of which were:

1. "How many three year old children have you treated for peritonitis?"

2. ". . . [I]n the period of time you graduated from medical school, you really have not been familiar with complaints exhibited by patients in the course of treatment."

While the objections to these questions were sustained, the witness, over objection, was permitted to answer a later question asked by appellant:

"Well, in the period of time since you graduated from medical school and been a doctor, have you ever observed any living person suffering from peritonitis?"

Following an affirmative answer, appellant then pursued by asking:

"And on how many different occasions have you — and what were their ages?"

Again an answer was permitted and further follow-up questions were asked without objection.

Appellant had expressly stated what he sought to elicit by this line of questioning in his colloquy at the bench with Judge Bowen:

" . . . I have the right to . . . attempt to refute his testimony to show he is not qualified, he has had no experience on which to base his opinion. . . .

Judge Bowen: You may cross examine him on that, but what does the variety of practice or anything, or any other type of practice have to do with that. He obviously doesn't practice clinical medicine.

Mr. Dorsey: That is the point I want to bring out to the jury Your Honor. You see, not to attack his report, but to attack his opinions. . . ."

Appellant's purpose was also reflected in the third question to which an objection was sustained:

3. "Doctor then you have not been engaged in the practice of medicine in which you would diagnose and treat patients?"

Once again we find that the appellant provided an opportunity for the judge to correct his former error and once again, intentionally or not, he did so, this time by permitting the question and answer, uninterrupted by an objection.

"Q What practical experience do you have doctor from subjective complaints made from living persons that you have observed? What practical experience do you have to state your opinion as to the objective and subjective complaints a three year old child would have from suffering from peritonitis some five hours prior to her death?

A In medical school, before you become a doctor you are engaged in diagnosing and treatment of all kinds of diseases, either medical, physical, pediatrics, whatever. I have already stated I am not a pediatrician, I am a pathologist, but as far as the medical diagnosis of patients, I have been engaged in that ever since the days of medical school. As far as treatment of patients, the same.

Q You are then engaged in the practice of medicine?

A Pathology is a practice of medicine, it is a speciality of medicine.

Q You could conduct a test.

A Yes."

Each question to which an objection was originally sustained was later permitted — practically in *totidem verbis*. The purpose for which the examination was sought, as expressed by appellant, was fulfilled to appellant's seeming satisfaction since he voluntarily abandoned that line of questions after successfully covering the issue on his second attempt.

As pointed out in *Chapman v. California,* 386 U. S. 18, 23, not all "trial errors which violate the Constitution automatically call for reversal." The error here was rendered harmless because subsequently corrected. Although the trial judge did not expressly reverse his prior rulings, he did so in fact, by a contrary ruling when the question concerning Dr. Hire's experience was raised a second time. The follow-up questions were asked and answered without objection.

We cannot find that there is a reasonable possibility that the initial erroneous rulings of the trial judge contributed to the conviction. See *Chapman, supra* at 23. Recognizing that opinion evidence is of the "very lowest order and the most unsatisfactory character," *Wimpling v. State,* 171 Md. 362, 376, and thus implicitly should be subjected to rigid cross-examination, we find no question asked, or proffered, which was not subsequently permitted even though initially denied. We conclude that the "minds of an average jury" would not have found the State's case significantly less persuasive had the questions been permitted when first asked rather than when ultimately allowed. *Schneble v. Florida,* 405 U. S. 427, 432. The jurors had the benefit of the defense theory before them, *cf. Davis v. Alaska,* 415 U. S. at 317.

*Judgment affirmed.*

## APPENDIX

"Now the actions which the Statute prescribes are abuse which results from cruel or inhumane treatment. I don't think that those words need any special definition to you ladies and gentlemen. You know what is cruel and I am sure you know what the word 'inhumane' means. If the treatment is cruel or inhumane and it results in physical injury, it is absue within the definition of this Statute. If physical injury results as a result of a malicious act, it is also abuse within the meaning of this Statute. Perhaps the word malicious does need some further explanation for you. An act is done with malice or it is malicious if it is an act that is done with an evil or wicked intent or motive. The term malice implies an evil or imports, I should say, the term 'malice' imports an evil wicked purpose in the doing of an act.

.   .   .

In addition to the duty to refrain from doing that sort of thing, a parent or custodian of a child, has by virtue of the position by which they stand and the dependency of the child, a duty to take positive action and affirmative action to see that physical injury does not occur to that child if they are put on notice that the need for such action exists. You may be entitled to do what the Pharisee and the Levite did, that is cross the road and go down the other side if the person who is in danger of expiring is not your child, but when you have a child who is in your care and custody, you have an affirmative duty, not only to provide it with shelter and sustenance, but also those reasonable medical necessities which may mean the difference between its chance to life and death.

Now the question of whether or not such action is called for is one of fact and that must be resolved by you ladies and gentlemen. Critical to the resolution to that question we think and so advise you, is the extent of information or notice that the person having custody of the child had of the necessity for such action.

Now, there are some actions which may be termed under the heading of neglect of children which contravene the

criminal law. Neglect generally encompasses the failure to provide the basic necessities for life; that is, minimum shelter, minimum degree of sustenance and minimum degree of supervision and protection. There comes a time in this country when if the treatment of your children falls below what the community expects in these areas and the matter is brought to the attention of the authorities, you will be charged with neglect and the State will step in to provide what the parent or the custodian is deficient in providing.

Some where and the Court is not prepared to say to you where that line is to be drawn, some where in the relative descending scale actions become abuse as opposed to neglect. The Court would suggest that the distinction between abuse and neglect in the failure to dó what you ought to do as opposed to doing something you ought not to do in direct relationship to the child, comes when the failure becomes a failure to provide something that is in the absence of its provision life threatening or apt to produce death or serious bodily harm; thus five meals in a row missed, may produce a very hungry and a very distressed child, but alone not necessarily life threatening. There comes a time when medical attention is called for and obviously necessary, if it is not provided, it is life threatening and it is on that position as I understand it that the State is proceeding in this case.

Whether the Defendant's conduct was actuated by malice or evil intent and whether you find it was of that, as a fact within the framework of this case, either neglect or abuse, is the question you ladies and gentlemen have to resolve.

. . .

The State must show that her conduct amounted to cruel and inhumane treatment of this child or that it was a malicious act and that as a result of the cruel and inhumane treatment or the malicious act, physical damage occurred to the child and that combination meets the definition of abuse in the Statute. Anything short of that, the Defendant must be acquitted.

This is not a case where we are trying somebody for neglect, this is a separate criminal act of child abuse."