591 A.2d 468

**In re ADOPTION NO. 9979.**

**No. 59, Sept. Term, 1990.**

Court of Appeals of Maryland.

June 25, 1991.

James A. Shrybman (Harvey Schweitzer, Shrybman & Associates, on brief), Silver Spring, for appellant.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and CHARLES E. ORTH, Jr., Judge of the Court of Appeals of Maryland, (Retired, Specially Assigned), JJ.

McAULIFFE, Judge.

This appeal involves the interpretation of § 5–327 of the Family Law Article, Maryland Code (1984), which prohibits certain payments in connection with adoption placement. Appellants, the adopting parents, question whether the trial judge was correct in ruling that § 5–327 prohibits payment by the adopting parents to the natural mother of the cost of maternity clothes. We hold the payment is prohibited by the statute.

## I.

This case involves a direct adoption—an adoption not involving a licensed agency. The petition for the adoption of an infant child was filed in the Circuit Court for Montgomery County, Maryland. Each natural parent filed a consent to the adoption. An adoption investigation was conducted by a court investigator, who recommended that the petition be granted. The investigator requested, however, that the prospective adopting parents, personally or through their attorney, send to the investigator's office itemized bills for all payments made in connection with the adoption. Subsequently, appellants filed a statement of expenses, listing, in addition to attorneys' fees and court costs, payments to the natural mother of $378.35 for "reimbursement of hospitalization insurance," and $488.00 for "maternity clothes and related expenses."

At the adoption hearing, the trial judge questioned the appellants and their attorney concerning payments made to the natural mother. Appellants testified that all such payments were made through their attorney. Appellants' attorney submitted an affidavit from the natural mother, who said she had not kept any of the bills for maternity clothing because she did not anticipate placing the baby for adoption when she made the purchases. She did, however, itemize purchases totalling $488.00, for maternity clothes.[1] No explanation was given as to why the original expense item had been characterized as maternity clothes "and related expenses."[2]

At the conclusion of the hearing, the trial judge signed an order approving the adoption, but expressed concern about the payments that had been made to the natural mother for maternity clothes. He took that matter under advisement, and requested a memorandum of points and authorities. Subsequently, he entered an order finding that reimbursement for maternity clothing is not a permitted expense in adoption, and disallowing the payment. The adopting parents appealed to the Court of Special Appeals, and we

---

1. The natural mother reconstructed her expenses for maternity clothing as follows:

| | |
|---|---|
| 8 maternity blouses @ $15.00 | $120.00 |
| 9 maternity slacks @ $18.00 | 162.00 |
| 1 maternity dress @ $28.00 | 28.00 |
| 1 maternity dress @ $36.00 | 36.00 |
| 1 winter coat @ $78.00 | 78.00 |
| 8 maternity bras @ $6.00 | 48.00 |
| 2 pkgs. underwear @ $8.00 | 16.00 |
| TOTAL | $488.00 |

2. Interestingly, although appellants' statement of expenses lists only the maternity clothing and reimbursement of hospital insurance as amounts paid to the natural mother, the natural mother concluded her affidavit by stating that appellants "have paid for all of my expenses directly related to the pregnancy, birth, and adoption of the baby. The above itemization is one such pregnancy expenditure that I have made and for which I requested reimbursement."

issued a writ of certiorari on our own motion prior to consideration by that Court.

Appellants raise only one question in their brief:

Does Maryland law prohibit adoptive parents from reimbursing a natural mother for maternity clothes expenses?

The statute in question, § 5–327 of the Family Law Article, provides in pertinent part as follows:

(a) *In general.*—

(1) An agency, institution, or individual who renders any service in connection with the placement of an individual for adoption may not charge or receive from or on behalf of either the natural parent of the individual to be adopted, or from or on behalf of the individual who is adopting the individual, any compensation for the placement.

(2) This subsection does not prohibit the payment, by any interested person, of reasonable and customary charges or fees for hospital or medical or legal services.

  *   *   *   *   *   *

(c) *Prosecution by State's Attorney.*—The State's Attorney shall prosecute any violation of this section.

(d) *Penalty.*—A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $100 or imprisonment not exceeding 3 months, or both, for each offense.[3]

Appellants argue that the statute has no application to the payment made in this case for three reasons: 1) the statute does not apply to payments made to a natural parent; 2) the statute prohibits only payments that result in a profit to the recipient, and therefore does not prohibit reimbursement of expenses incurred; and, 3) in any event, payment for maternity clothing qualifies as a payment of reasonable and customary charges for "medical ... services" within the

---

**3.** Subsection (b) exempts from the operation of the statute certain payments made to licensed adoption agencies and institutions.

meaning of the statute. We disagree with appellants on all counts.

## II.

As we recently noted, adoptions were unknown at common law and are permitted only by statute. *In re: Lynn M.,* 312 Md. 461, 463, 540 A.2d 799 (1988). The statutory provision with which we are here concerned was originally enacted as § 85P of ch. 599 of the Acts of 1947. In its original form, it provided in pertinent part as follows:

> It shall be unlawful for any agency, institution, or individual rendering any service in connection with the placement of a child for adoption to charge or receive from or on behalf of either the natural parent or parents of the person to be adopted, or from or on behalf of the person or persons legally adopting such person, any compensation whatsoever for the placement service, but this shall not be construed to prohibit the payment by any interested persons of reasonable and customary charges or fees for hospital or medical or legal services.

That section was amended by ch. 648 of the Acts of 1970, which exempted certain payments made to licensed adoption agencies or institutions. The 1970 amendment also changed the description of prohibited payments from "any compensation whatsoever for the placement service" to "any compensation whatsoever for adoptive placement...." Originally codified in Art. 16, this provision was rewritten as a part of the Code revision process, and recodified as § 5–327 of the Family Law Article. *See* ch. 296 of the Acts of 1984. According to the Revisor's Note, only changes of style were made in the 1984 revision.

Appellants' first contention is that § 5–327 does not apply to payments made to a natural parent. They reason that when the General Assembly spoke of someone who "renders any service in connection with the placement of an individual for adoption," the legislative body must have meant doctors, lawyers, intermediaries, and other third persons, and not those who are directly involved in the place-

ment.[4]

We do not read the statute so narrowly. We believe that except for the very specific exceptions spelled out in the statute, the legislature intended to prohibit the payment of any compensation for an adoption placement. Any ambiguity in the language of the statute results from an attempt to include all forms of payment to all possible persons, rather than an intent to exclude those most logically intended to be covered. Excising language not applicable to the circumstances of this case, and substituting specific for general terms, § 5–327(a)(1) reads:

> An ... individual who renders any service in connection with the placement of a [child] for adoption may not charge or receive ... from or on behalf of the [person] who is adopting the [child], any compensation for the placement.

Describing a natural parent who signs a consent and turns over a child for adoption as one who "renders any service in connection with the placement of a [child]," may not be the warmest possible prose, but it literally does include the natural parents. Indeed, it might be difficult to think of anyone capable of rendering a greater "service in connection with the placement" than the natural parents.

One of the amendments to the statute made in 1970, to which we have earlier referred, suggests that the emphasis of the prohibition is intended to be on compensation paid for an adoption placement, and not on the term "service." While retaining the language relating to anyone "rendering any service" in the broad description of those intended to be covered by the statute's proscription of payment, the legis-

---

**4.** Appellants offered this interpretation of the statute for the first time during oral argument before this Court. They made no such contention in the trial court. Indeed, in their memorandum of points and authorities submitted to the trial judge, they argued that § 5–327 "clearly prohibits the payment of any 'compensation' to the natural parents by anyone in return for the adoptive placement," but went on to argue that "compensation" means profit. Their brief in this Court is to the same effect.

lature struck the word "service" from the operative language of the actual prohibition. Instead of prohibiting "any compensation whatsoever *for the placement service*," the statute was amended to prohibit "any compensation whatsoever *for adoptive placement*." [5] (Emphasis added.)

Contemporary interpretation of the statute strongly favors applicability of the prohibition to payments made directly to natural parents. A committee of Maryland judges recently filed a comprehensive report concerning independent adoptions, and devoted a section of the report to the problem of payments made for the benefit of natural parents.[6] Although the Committee noted that there is some disagreement among judges concerning the type of payments that will qualify for the exclusion as "hospital or medical or legal services," there is no suggestion in the report that the statute does not cover payments made directly to a natural parent. After discussing the potential evils of allowing expanded payments to or on behalf of natural parents, and the potential benefits of allowing "living expenses" to natural parents, as a few states do, the Committee said, at page 60 of its report:

> The Committee feels that the present language of [§] 5–327 achieves a proper balance between the competing interests that the statute addresses and believes that any further extension of its language might invite abuses.

In a recent comment, *Regulatory Options for Surrogate Arrangements in Maryland*, 18 U.Balt.L.Rev. 110, 119–22 (1988), the authors refer to § 5–327 and to Art. 27, § 35C, Md.Code (1957, 1987 Repl.Vol., 1990 Cum.Supp.) (a criminal statute prohibiting the sale, barter, or trade of a child) and

---

**5.** By reason of the Code revision amendment of 1984, the prohibition now is of payment of "any compensation for the placement." As previously noted, this change is one of style only.

**6.** Report of the Subcommittee to Study Uniform Procedures for Handling Independent Adoptions, Committee on Juvenile and Family Law of the Maryland Judicial Conference, 57–66 (Nov. 1, 1988).

conclude that "[t]he overriding objective of these statutes is to regulate arrangements between a mother and strangers." *Id.* at 121.

In 1988, Senator Barbara Hoffman introduced Senate Bill 436, which would have amended § 5–327 to permit the payment of

reasonable expenses associated with the pregnancy of the natural mother, including, but not limited to, lost wages, food, shelter, and clothing, provided that the payment is authorized by the court for good cause shown. The expenses shall be certified to the court and payment may be authorized before or after a petition for adoption is filed.

In her letter to the Department of Legislative Reference requesting that the appropriate bill be drafted, Senator Hoffman said "what I want to accomplish is that the natural mother in an adoption could receive payments that are now forbidden by Maryland law." [7] The Bill received an unfavorable report from the House Judiciary Committee, and was not passed.

Appellants argue that ch. 300 of Acts of 1989, codified at Art. 27, § 35C, was enacted because § 5–327 did not address compensation paid to a natural parent. Article 27, § 35C provides:

(a) *In general.*—A person may not sell, barter, or trade, or offer to sell, barter, or trade a child for money or property, either real or personal, or anything else of value.

(b) *Violation constitutes misdemeanor; penalty.*—A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding

---

7. Letter from Senator Barbara A. Hoffman to Mr. Carvel Payne, Department of Legislative Reference (Jan. 4, 1988), on file with the Department of Legislative Reference, Annapolis, Legislative History file of Senate Bill 436.

$10,000 or imprisonment in the penitentiary not exceeding 5 years or both for each offense.

Chapter 300 of the Acts of 1989 enacted Senate Bill 58. That Bill, introduced by Senators Hollinger and Hoffman, originally would have amended § 5-327, initially by raising the possible penalty from a fine of $100 and imprisonment for three months, to a fine of $10,000 and imprisonment for five years. An early amendment would have added to § 5-327 language very similar to that which now appears at Art. 27, § 35C(a). As ultimately amended and enacted, Senate Bill 58 did not, however, amend § 5-327. Instead, it created the new criminal offense relating to the attempted or consummated sale, barter, or trade of a child.

The legislative history of Senate Bill 58 indicates that it was intended "to address a concern raised by a representative of the Maryland States Attorney's Association that current law does not explicitly prohibit baby selling by a parent," and that the penalty for such conduct should be greater than the penalty provided by § 5-327. Floor Report, Senate Bill 58, Senate Judicial Proceedings Committee. The sponsors' original concern grew out of a case involving a Pennsylvania couple who ran an advertisement in a Baltimore area magazine offering their child for sale. Undercover Maryland State Police officers, acting in concert with Pennsylvania authorities, agreed to buy the baby for $30,000. Delivery of the baby occurred in Pennsylvania and the parents were prosecuted in that jurisdiction. *See The Capital*, 3 December 1988. Maryland officials became concerned when they realized that Maryland law did not include a specific prohibition against the sale of a child, and that the existing law relating to unpermitted compensation paid in connection with an adoption placement might be too narrow to cover an outright sale, and in any event provided for penalties that were not commensurate with the gravity of the offense of selling a child. During the course of the Bill's consideration by the legislature, another case arose concerning the alleged sale of a child by its mother for

cocaine and cash. An Anne Arundel County circuit judge held that the mother could not be prosecuted under § 5–327 for the sale of the baby, and this action apparently furnished additional impetus for the ultimate amendment of Senate Bill 58 to create a new criminal offense, and for the passage of the Bill. *See Baltimore Sun,* 1 April 1989.

We have no way of knowing whether the decision of the Anne Arundel County circuit judge was based upon the belief that the sale of the baby was not tied in with an adoption placement, and thus not embraced within the prohibition of § 5–327, or whether, as appellants suggest, the decision rested upon a belief that the prohibition of § 5–327 does not extend to payments made directly to a natural parent. If the decision rested on the latter ground, it was in error for the reasons already given. Additionally, we find it inconceivable that the legislature would have intended to exclude payments to natural parents from the only statute dealing with impermissible payments for adoption placements. We hold that payments to natural parents fall within the prohibition of § 5–327.

### III.

Appellants next argue that the word "compensation" in § 5–327 means "profit" and "does not in any way address the reimbursement for legitimate expenses that relate to the pregnancy, birth or adoption of the child." Thus, they argue,

> [t]he natural mother's receipt of money in reimbursement for maternity clothes is not compensation. She is no better off after she was reimbursed for the maternity clothes than she was before. She is simply made whole.

Appellants' Brief, 6–7.

Appellants are wrong. The basic meaning of compensation is reimbursement—reparation—that which makes whole. Compensation has been defined as:

The act or action of making up, making good, or counter-balancing: rendering equal.... Something that constitutes an equivalent or recompense....

*Webster's Third New International Dictionary* 463 (1963). The act of compensating.... Something given or received as an equivalent or as reparation for a loss, service, or debt; a recompense; an indemnity....

*The American Heritage Desk Dictionary* 211 (1981).

As used in § 5–327, the word "compensation" is undoubtedly broad enough to include profit, but it is most certainly not limited to profit. Giving the word its ordinary meaning, reimbursement for expenditures for maternity clothes is clearly "compensation."

## IV.

Appellants' final contention is that reimbursement for maternity clothes falls within the statutory exemption for payment of "reasonable and customary charges or fees for hospital or medical or legal services." § 5–327(a)(2). Appellants concede that reimbursement for maternity clothes cannot be considered a payment of hospital or legal services, but insist that it qualifies as payment of a medical service. Their argument is difficult to follow. Factually, and logically, the cost of maternity clothes is not a medical expense. Certainly, the lack of clothing could have an adverse effect upon the health and welfare of the natural mother, but the same could be said for the lack of food or shelter, and reimbursement for those expenses would not constitute payment of customary medical expenses.

We recognize that there is an ongoing debate concerning what should be permitted as a reasonable reimbursement of expenses to, or on behalf of, a natural mother in an adoption setting. *See* Report of the Subcommittee to Study Uniform Procedures for Handling Independent Adoptions, Committee on Juvenile and Family Law of the Maryland Judicial Conference, 57–66 (Nov. 1, 1988). It is the General Assembly, however, and not the courts, which must make

the final decision on such matters. Currently, the law concerning compensation payable in connection with an adoption placement is strict. Section 5–327 contains a general prohibition against all payments, followed by a narrow exception for "reasonable and customary charges or fees for hospital or medical or legal services." We will not, by artificially stretching the definition of commonly understood terms, broaden the exception beyond the obvious legislative intendment.

As to the single question raised by appellants, we hold that the payments of compensation to or on behalf of a natural parent are included within the prohibition of § 5–327 of the Family Law Article, and that reimbursement for the purchase of maternity clothing does not constitute a payment of customary medical charges within the meaning of the narrow exception contained in the statute.

## V.

There is an additional issue, not raised by appellants, that we elect to consider and decide. *See* Maryland Rule 8–131. That issue concerns the validity of the order of repayment entered by the trial judge.

■■■ The hearing on the adoption was held on 25 October 1989. Appellants and their attorney were present, but the natural parents and their attorney were not. The trial judge questioned the propriety of the payments made to the natural mother for maternity clothing and indicated his provisional belief that the payments were contrary to Maryland law. He decided to grant the adoption, but to retain jurisdiction to decide the legality of the payments. The trial judge told appellants' attorney:

I am signing the decree of adoption. I am going to give you 10 days to give me authority to justify the payment of the maternity clothes expenses and if I am not convinced, I am going to order you to reimburse the [appellants] the $488.

The signed adoption order, however, made no mention of the maternity clothing issue.

On 14 November 1989, counsel for the appellants submitted a memorandum of law to the circuit court concerning the maternity clothing reimbursement. The circuit court, on 14 December 1989, signed an order requiring the natural mother to pay to the appellants $488, representing reimbursement for the maternity clothing expense.[8] Until this order, there had never been a hint in the case that a money judgment or order to pay money might be entered against the natural mother. The December 14 order shows on its face that copies of the order were mailed to the attorneys for the adopting parents. There is no indication on the order, or elsewhere in the record, that a copy of the order was sent to the natural mother or to her attorney in New Jersey.

It was entirely appropriate for the trial judge to consider, in determining whether the adoption should be granted, whether § 5-327 had been violated. The illegal payment of compensation to a natural parent could have considerable bearing on the question of the voluntariness of that parent's consent to adoption, and could also impact on the trial judge's determination of the fitness of the prospective adopting parents. Here, however, notwithstanding his misgivings concerning the legality of the payments, the trial judge determined that the adoption should be granted, and he signed an order to that effect.

Section 5-327 is a penal statute, and enforcement of its terms should ordinarily be by criminal proceedings. We need not consider whether the statute may also be used to support a civil action, or to support ancillary civil relief in an adoption action, because it is clear in the case before us that core concepts of due process would be violated by the entry of an order directing repayment by the natural moth-

---

8. The 14 December 1989 order concluded as follows: "ORDERED, that the natural mother return to the adopting parents the monies paid out for maternity clothes."

er when she had been given no notice that such an order might be entered and no opportunity to contest it. *See Travelers v. Nationwide,* 244 Md. 401, 410–11, 224 A.2d 285 (1966) ("[w]here a judgment was outside the cause of action stated in the complaint and the defendant was not given a fair opportunity to defend against the claim on which the judgment was based, the judgment is invalid and subject to collateral attack"). We shall vacate the order directing repayment.

ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY DATED 14 DECEMBER 1989 VACATED; COSTS TO BE PAID BY APPELLANTS.

Concurring Opinion by ELDRIDGE, J., in which RODOWSKY, J., joins.

ELDRIDGE, Judge, concurring.

I agree with the majority that the circuit court's December 14, 1989, order is invalid and must be vacated on due process grounds. There are several procedural deficiencies requiring reversal of the order.

Although vacating the order appealed from on due process grounds, the majority opinion extensively deals with the meaning and application of Maryland Code (1984, 1990 Cum.Supp.), § 5–327 of the Family Law Article. I respectfully disagree with the majority's interpretation of § 5–327.

### I.

The adopting parents, who filed the petition for adoption below and are the appellants here, are a married couple residing in Montgomery County, Maryland. The natural parents are a married couple residing in New Jersey. The natural mother, prior to her present marriage, had placed another child with the appellants for adoption. In connection with the earlier adoption, the appellants contacted an attorney who was known to arrange independent adoptions. They placed advertisements in newspapers, and, through such an advertisement, they met the natural mother. The

parties were pleased with each other, and the first adoption was finalized in 1987. Appellants and the natural mother maintained contact and friendly relations after the adoption.

Sometime in 1988, the natural mother again contacted the appellants, stating that she had gotten married and was again pregnant. Because of strained financial circumstances, however, both natural parents believed that it would be in the best interests of the child if the child were placed for adoption with the appellants.[1] The child was born February 23, 1989. A petition for adoption and motion for temporary custody were filed by the appellants in the Montgomery County Circuit Court on March 2, 1989.[2] Shortly thereafter, documents signed by the natural parents were filed which recited that the natural parents joined in the petition for adoption. Neither the petition for adoption nor any of the other documents filed in court contained any intimation whatsoever that there might be a claim or demand for money against the natural mother. In fact, as just pointed out, the natural mother was a co-plaintiff.

The circuit court referred the matter to the court's investigators' unit on March 16, 1989. On May 22, 1989, temporary custody of the adoptee was granted to the appellants, although the child had actually been in their custody since his release from the hospital on February 28, 1989. The investigator's report was filed with the circuit court in October 1989. The investigator apparently requested that the appellants file a certification of the expenses paid on

---

**1.** At this time, the appellants had not been seeking to adopt another child.

**2.** Along with the petition for adoption, appellants' attorney also filed the following documents: consent of both natural parents to the adoption, the natural parents' waiver of notice and service of process in the adoption proceeding, affidavits of the natural parents attesting to the facts that they had not received any money or anything of value in exchange for their consent and had not been pressured to consent, a delegation of guardianship, and a hospital and medical information release form.

behalf of the natural mother. This was submitted to the court along with the investigator's report.[3]

The hearing on the adoption petition was held in the circuit court on October 25, 1989. Other than court personnel, the only persons present were the adopting parents and one of their attorneys. Neither the natural parents nor their attorney was in attendance. The adopting parents were called by their attorney to testify on their own behalf. During their testimony, both adopting parents were questioned by the trial judge regarding a modest expense paid on behalf of the natural mother for maternity clothing. Both adopting parents testified that they had no objection to paying for the clothing and that they had not been informed that maternity clothing was not an allowable expense under Maryland law. The trial judge indicated that he believed that the payments were contrary to Maryland law. Appellants' attorney responded that such payments were regularly approved of in adoption cases throughout the State, and that in no other adoption in which he had been involved had a court ever indicated that such an expense was not permissible.[4] The circuit court proceeded on October 25, 1989, to enter a final decree of adoption. The court, however, gave the appellants' attorney ten days in which to find authority to justify the payment of the

---

3. Requiring the adopting parents to certify all expenses paid by them on behalf of the natural mother appears to be a practice required by some trial judges in adoption proceedings. *See* Report of the Subcommittee to Study Uniform Procedures for Handling Independent Adoptions, Committee on Juvenile and Family Law of the Maryland Judicial Committee, 58 (Nov. 1, 1988). Nevertheless, neither the adoption statutes nor the procedural rules governing adoption proceedings require the adopting parents to file a certification of expenses. Both House Bill 491 of the 1990 session of the General Assembly and House Bill 880 of the 1991 session would have required such a certification. Neither bill was enacted, however. In light of the statutes, rules, and legislative history, the practice by some trial judges of requiring the certification seems to be of doubtful validity.

4. Furthermore, the appellants' attorney stated that in the first adoption involving the same parties, the Montgomery County Circuit Court did not indicate disapproval of reimbursement for maternity clothing by the appellants to the natural mother.

maternity clothing expense; otherwise, the court said, an order would be entered requiring that the *appellants' attorney* pay the appellants $488 representing the expense for maternity clothing. The trial judge thus stated to the appellants' attorney:

"I am signing the decree of adoption. I am going to give you 10 days to give me authority to justify the payment of the maternity clothes expenses and if I am not convinced, I am going to order *you* to reimburse the [appellants] the $488." (Emphasis added).

Nevertheless, the signed adoption decree made no reference whatsoever to the matter of maternity clothing; moreover, the decree contained nothing which would indicate that the court was attempting to retain jurisdiction.

The appellants' attorney, on November 14, 1989, submitted a legal memorandum regarding the matter of reimbursement for maternity clothing. On December 14, 1989, the trial judge signed an order requiring *the natural mother* to pay $488 to the appellants as reimbursement for the maternity clothing expenditure. As pointed out in the majority opinion, the record indicates that no copy of the order was sent to the natural mother or to her attorney.

The adopting parents filed an appeal, and this Court issued a writ of certiorari prior to any proceedings in the Court of Special Appeals.

## II.

I fully agree with the majority that the order requiring the natural mother to pay $488 was invalid on due process grounds because of the lack of notice to the natural mother. Furthermore, there were other procedural irregularities which require reversal of the December 14, 1989, order.

## A.

The trial judge *sua sponte* injected the $488 "claim" into the case for the first time at the October 25, 1989, hearing on the petition for adoption. Neither the natural mother

nor her attorney were present at that hearing. In addition, even if they had been present at the October 25th hearing, or had been informed later of what the trial judge had said at the hearing, neither the natural mother nor her attorney would have been on notice of a possible monetary "claim" against the natural mother. On the contrary, the trial judge on October 25th stated that if the reimbursement for maternity clothing were unlawful, he would enter an order requiring the adopting parents' attorney to pay the money to the adopting parents.

It was not until the final order in the matter, and the order now being appealed, that there was notice to anyone of a monetary "claim" against the natural mother. Even then, there was no notice given to the natural mother or to her attorney. A copy of the December 14, 1989, money judgment or order to pay money was not sent by the court to the natural mother or to her attorney. As far as we know, the natural mother still does not know of the monetary "claim" against her. She has not had any opportunity to defend, including any opportunity to defend in this Court.

Under the circumstances, it would appear that the December 14th order is utterly void. It clearly constitutes a denial of due process. As stated in *Travelers v. Nationwide*, 244 Md. 401, 410–411, 224 A.2d 285, 290 (1966):

"The violation of a constitutional right may make the proceedings in which the violation took place either voidable or void.

\* \* \* \* \* \*

"In this case, however, the violation of the constitutional right of Plaza and Paul went to the fairness of the conduct of the trial and accordingly the money judgment obtained in violation of that right was invalid.

"Where a judgment was outside the cause of action stated in the complaint and the defendant was not given a fair opportunity to defend against the claim on which the judgment was based, the judgment is invalid and subject to collateral attack."

In *Sullivan v. Insurance Comm'r*, 291 Md. 277, 285, 434 A.2d 1024, 1028 (1981), Judge Rodowsky for the Court quoted the Restatement of Judgments § 6 (1942), that " '[a] judgment is void unless a reasonable method of notification is employed and a reasonable opportunity to be heard afforded to persons affected.' " *See, e.g., Reynolds v. Stockton*, 140 U.S. 254, 265–266, 11 S.Ct. 773, 776, 35 L.Ed. 464 (1891); *Blue Cross v. Franklin Sq. Hosp.*, 277 Md. 93, 101, 352 A.2d 798, 804 (1976) ("due process requires that a party to a proceeding is entitled to both notice and an opportunity to be heard on the issues to be decided in a case"); *Burns v. Midland*, 247 Md. 548, 553, 234 A.2d 162, 165 (1967); *Belt, Adm'r. v. Blackburn, Adm'r.*, 28 Md. 227, 243 (1868).

### B.

Another procedural deficiency requiring reversal of the December 14, 1989, order is that the pleadings in this case did not assert a claim for monetary or any other relief against anyone. The natural mother was not a defendant; rather, she was a co-plaintiff seeking relief regarding the status of the child. The pleadings were never amended to assert a claim against the natural mother. Under such circumstances, a money judgment or order to pay money against the natural mother was entirely unauthorized. *See, e.g., Travelers v. Nationwide, supra*, 244 Md. at 407, 224 A.2d at 288; *Poe v. Munich Re–Insurance Co.*, 126 Md. 520, 95 A. 164 (1915).

In addition, the adopting parents clearly did not want, and do not now want, a money judgment in their favor for $488. I am totally unaware of any principle of law which authorizes a trial court to force money upon a competent adult against that person's will.

### C.

Finally, once the decree of adoption was entered on October 25, 1989, the trial judge had no authority thereafter to enter a money judgment or order to pay money.

Adoption was unknown at common law and exists in Maryland solely by statute. *See, e.g., In re Lynn M.,* 312 Md. 461, 463, 540 A.2d 799, 800 (1988); *McGarvey v. State,* 311 Md. 233, 236, 533 A.2d 690, 691 (1987); *Bridges v. Nicely,* 304 Md. 1, 4, 497 A.2d 142, 143 (1985); *Dawson v. Eversberg,* 257 Md. 308, 312, 262 A.2d 729, 731 (1970); *Falck v. Chadwick,* 190 Md. 461, 467, 59 A.2d 187, 189 (1948); *Spencer v. Franks,* 173 Md. 73, 81, 195 A. 306, 309 (1937). In an adoption proceeding, a trial judge's authority is limited by the adoption statutes. This Court has repeatedly pointed out that " 'the measure of the chancellor's authority is the [adoption] statute.' " *Dawson v. Eversberg, supra,* 257 Md. at 312, 262 A.2d at 731, quoting *Spencer v. Franks, supra,* 173 Md. at 81, 195 A. at 309. *See Ex parte Lagumis,* 186 Md. 97, 102, 46 A.2d 189, 191 (1946). *See also Anderson v. Barkman,* 195 Md. 94, 99, 72 A.2d 709, 711 (1950); *Alston v. Thomas,* 161 Md. 617, 621, 158 A. 24, 25–26 (1932).

Furthermore, an adoption proceeding is concerned with a limited matter, the *status* of the person to be adopted. *Spencer v. Franks, supra,* 173 Md. at 83, 195 A. at 310; *Waller v. Ellis,* 169 Md. 15, 25, 179 A. 289, 293 (1935).

In a child adoption proceeding, in making the determination regarding the status of the child, the underlying issue before the court is whether it is in the best interests and welfare of the child to grant the adoption petition. *In re Lynn M., supra,* 312 Md. at 463, 540 A.2d at 800; *Lippy v. Breidenstein,* 249 Md. 415, 420, 240 A.2d 251, 254 (1968); *Walker v. Gardner,* 221 Md. 280, 284, 157 A.2d 273, 275 (1960); *King v. Shandrowski,* 218 Md. 38, 43, 145 A.2d 281, 284 (1958); *Ex parte Frantum,* 214 Md. 100, 103, 133 A.2d 408, 410, *cert. denied,* 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957); *Ex parte Anderson,* 199 Md. 316, 322, 86 A.2d 516, 519 (1952); *Falck v. Chadwick, supra,* 190 Md. at 467, 59 A.2d at 190; *Waller v. Ellis, supra,* 169 Md. at 23, 179 A. at 293 ("the whole purpose of the [adoption] is to insure the welfare of the infant"). Obviously, whether or not the adopting parents may have violated any criminal statute,

including § 5–327, might reflect upon their fitness to be parents and thus would be a relevant consideration in determining the best interests of the child. In the present case, however, the trial judge decided that it was in the best interests and welfare of the child to grant the petition for adoption, and the judge signed a final decree of adoption on October 25, 1989.

Once the trial court has determined that it is in the best interests of the child to grant the petition, and has then signed the adoption decree, the statutes contemplate that the adoption proceeding is at an end. *Waller v. Ellis, supra*, 169 Md. at 25, 179 A. at 293 ("upon the passage of a decree of adoption," then "the jurisdiction of the court under the statute is at an end"). *See Falck v. Chadwick, supra*, 190 Md. at 467, 59 A.2d at 189 (after "the decree of adoption is entered," the "Court is not invested with continuous authority in the cause thenceforth").

In *Spencer v. Franks, supra*, the trial court, after granting the petition for adoption, went on to grant certain visitation rights and made certain provisions concerning custody. This Court reversed the visitation and custody orders, holding that they were beyond the trial court's jurisdiction and void. This Court stated (173 Md. at 81–82, 195 A. at 309–310):

"The power to decree an adoption did not exist at common law, and is purely a creation of statute. *Hillers v. Taylor*, 108 Md. 148, 155, 156, 69 A. 715 [1908]; *Zimmerman v. Thomas*, 152 Md. 263, 265, 136 A. 637 [1927]. So, the measure of the chancellor's authority is the statute. The statute, however, confers jurisdiction with respect to the single subject matter of adoption, with a permitted change of the child's name, if the petition contains a prayer to that effect. The record shows that all the requirements of the statute were satisfied for the passage of a decree declaring the minor child the adopted child of the petitioners, with a change of name. *Backus*

*v. Reynolds,* 159 Md. 601, 152 A. 109 [1930]. The statute authorized no other decree...."

And later (173 Md. at 83, 195 A. at 310):

"It was not the intention of the statute that after the decree of adoption the court should be invested with continuous authority in the cause thenceforth.... With the entry of the final decree of adoption and its enrollment, the chancellor has, for most purposes, exhausted the jurisdiction of the court."

The Court in *Spencer* concluded by pointing out that if orders concerning visitation or custody are warranted, they could be the subject of "subsequent original proceedings" but had no place in the adoption case. 173 Md. at 84, 195 A. at 311.

Similarly, in the case at bar, the post-decree judgment or order to pay money was beyond the trial court's authority in an adoption proceeding. Under our decisions, once the decree of adoption was entered, the matter should have terminated.

### III.

Although I concur that the trial judge's December 14, 1989, order must be vacated on procedural grounds, I cannot agree with those portions of the majority opinion regarding the meaning of § 5–327 of the Family Law Article.

By its plain terms, § 5–327 does not apply to the adopting parents' reimbursement of expenses to the natural parents. Subsection (a)(1) of the statute states (emphasis added):

"(1) An *agency, institution, or individual who renders any service in connection with the placement of an individual for adoption* may not charge or receive from or on behalf of either the natural parent of the individual to be adopted, or from or on behalf of the individual who is adopting the individual, any compensation for the placement."

The provision was obviously intended to prohibit third party intermediaries from profiting by arranging adoptions. It stretches the bounds of credulity to interpret the phrase "individual who renders any service in connection with the placement of an individual for adoption ..." as including the natural mother who, often due to economic circumstances, may be forced to place her child with another family. Furthermore, the statutory language clearly draws a distinction between an "agency, institution or individual who renders any service" and the natural or adopting parents.

Section 5–327 was originally enacted by Ch. 599 of the Acts of 1947. The Report of the Commission to Study Revision of Adoption Laws of the State of Maryland accompanied the bill that was enacted as Ch. 599. The report provided a syllabus of the bill which, in reference to current § 5–327(a), stated that

"[t]o prevent the barter of children, there is a prohibition against the *taking of compensation* by anyone *for the placement of a child."* (Emphasis added).

This clearly pertains to parties who arrange for the adoptive placement of children and then seek to elicit a fee for such service from the natural or the adopting parents.

Commentators who have considered the statute agree that the prohibition on compensation refers to third parties, as opposed to the natural parents. *See* Comment, *Regulatory Options For Surrogate Arrangements in Maryland,* 18 U.Balt.L.Rev. 110, 120 (1988) (in discussing the application of § 5–327 to surrogacy arrangements the author states that under the language of the statute discouragement of contracts arranged by third-party intermediaries appears to be an explicit objective of the statute); Messitte and Hunter, *Independent Adoptions: Some Considerations,* 21 Md.B.J. 28, 29 (Jan./Feb. 1988) (§ 5–327 is aimed at assuring that the prospective adoptors' attorney/intermediary is not acting as a broker for finding a child); Katz, *Surrogate Motherhood and the Baby–Selling Laws,* 20 Colum.J.L. & Soc.Probs. 1, 8 (1986) (includes § 5–327 of the

Maryland Family Law Article in a list of twenty-four state statutes prohibiting baby brokering and "specifically targeted at the elimination of the baby black market"); Strahorn, *Changes Made By the New Adoption Law*, 10 Md.L.Rev. 20, 27 (1949) (§ 5–327 "prohibits, and makes criminal the receiving of compensation for arranging an adoption, with certain proper exceptions for hospital, medical, and legal fees").

Other courts in Maryland have interpreted § 5–327 as applying only to third parties. In 1989, the Circuit Court for Anne Arundel County dismissed a criminal prosecution under § 5–327 against parents who attempted to sell their baby for money and cocaine, holding that § 5–327 applied only to third parties.

In response to the Anne Arundel County case, in January 1989, Senator Paula C. Hollinger introduced Senate Bill 58 in the Maryland Senate. In testimony about the bill before the House Judiciary Committee, she stated:

"I am sure all of you are familiar with the most recent case of baby selling here in Anne Arundel County.... In this instance a Severn couple allegedly tried to sell their baby for $3,500 cash and more than 3 ounces of uncut cocaine. Unfortunately, because current law does not allow for parents selling or bartering their babies, Judge Bruce Williams of Anne Arundel County Circuit Court had to dismiss the case yesterday because current law only addresses the issue of a third party attempting to gain compensation."

*See* the Department of Legislative Reference's file on Senate Bill 58 of the 1989 Session of the General Assembly. As originally introduced, Senate Bill 58 would have broadened the language of § 5–327 to include payments of money or value made to natural parents in exchange for their children, and would have stiffened the penalties provided by § 5–327. *See* Department of Legislative Reference's file on Senate Bill 58. Ultimately, however, the bill was enacted as a completely separate law, and codified at Code (1957, 1987

Repl.Vol., 1990 Cum.Supp.), Article 27, § 35C.[5]   The fact
that this law, aimed at preventing the selling of children by
natural parents, was enacted as a separate statute from
§ 5–327, underscores that the two provisions address differ-
ent problems and are aimed at different classes of violators.
If § 5–327 covered payments made to a natural parent, then
Art. 27, § 35C, would be largely superfluous.   Moreover, in
House Bill 491 of the 1990 session, the language of Art. 27,
§ 35C, would have been added to the adoption subtitle of
the Courts and Judicial Proceedings Article.   House Bill
491, however, was not enacted.

The legislative history of § 5–327, and its relation to Art.
27, § 35C, demonstrate that § 5–327 was not intended to
apply to payments made to natural parents.[6]

---

**5.**  Article 27, § 35C, provides as follows:
  "§ 35C.  Child sale, barter or trade prohibited.
    "(a) *In general.*—A person may not sell, barter, or trade, or offer
  to sell, barter, or trade a child for money or property, either real or
  personal, or anything else of value.
    (b) *Violation constitutes misdemeanor; penalty.*—A person who
  violates this section is guilty of a misdemeanor and on conviction is
  subject to a fine not exceeding $10,000 or imprisonment in the
  penitentiary not exceeding 5 years or both for each offense."

**6.**  In support of its argument that § 5–327 applies to payments made
  directly to natural parents, the majority relies on a report of a
  subcommittee of the Maryland Judicial Conference.  *See* Report of
  the Subcommittee to Study Uniform Procedures for Handling Inde-
  pendent Adoptions, Committee on Juvenile and Family Law of the
  Maryland Judicial Conference (Nov. 1, 1988).  The report details the
  manner in which § 5–327 is interpreted by judges in this State, and
  expresses the opinion of the four trial judges comprising the subcom-
  mittee as to how and to whom § 5–327 should be applied.  The
  majority's reliance on the report as support for its interpretation of
  § 5–327 is obviously misplaced.
    The subcommittee report is nothing more than the particular view
  of the four trial judges making up the subcommittee as to how
  § 5–327 should be applied.  It is not "legislative history" with regard
  to § 5–327, as it in no way reflects the views of members of the
  General Assembly.
    Moreover, the original version of § 5–327 was enacted in 1947.  *See*
  Ch. 599 of the Acts of 1947.  The Judicial Conference subcommittee
  report was written forty-one years later in 1988.  Under no circum-
  stance can the report be said to be contemporaneous with the enact-
  ment of the statute.  Even when the Legislature itself attempts to

Finally, as the majority opinion points out, § 5–327 is a criminal statute. Consequently it is subject to the well established principles for construing criminal statutes. Even the majority opinion seems to acknowledge that there is "ambiguity in the language of the statute," and the majority states that "[d]escribing a natural parent who signs a consent and turns over a child for adoption as one who 'renders any service in connection with the placement of a [child],' may not be the warmest possible prose...." (Opinion pp. 44–45). Very recently, however, Judge Chasanow stated for a unanimous Court that "[w]here a [penal] statute is ambiguous and the legislative intent is in doubt, the courts are inclined toward the construction most favorable to the accused." *Belman v. State*, 322 Md. 207, 213, 586 A.2d 1281, 1284 (1991). The Court recently set forth the same principle in *State v. Kennedy*, 320 Md. 749, 754, 580 A.2d 193, 195 (1990), stating: "Generally, in construing penal statutes we employ the 'rule of lenity,' that is, statutes are strictly construed, in favor of the accused." And in *State v. Fabritz*, 276 Md. 416, 422, 348 A.2d 275, 279 (1975), Chief Judge Murphy for the Court put it this way: "It is, of course, well settled that penal statutes must be strictly construed, *State v. Fleming*, 173 Md. 192, 195 A. 392 (1937), 'by which is meant that courts will not extend the punishment to cases not plainly within the language used,' *State v. Archer*, 73 Md. 44, 57, 20 A. 172, 172 (1890)."

In light of the language and legislative history of § 5–327, this statute, containing only a criminal sanction, should not be construed to encompass a small reimburse-

---

express what its predecessors intended by an earlier enactment, such later expressions are given little weight as to the meaning of the prior law. *See American Recovery Co. v. Dep't of Health*, 306 Md. 12, 18, 506 A.2d 1171, 1174 (1986); *Collier v. Connolley*, 285 Md. 123, 125–126, 400 A.2d 1107, 1108 (1979); *Director v. Myers*, 232 Md. 213, 218, 192 A.2d 278, 280 (1963); *A.G. Crunkleton v. Barkdoll*, 227 Md. 364, 369, 177 A.2d 252, 255 (1962). If subsequent statements by the Legislature as to legislative intent carry little weight, then the opinions of four trial judges coming many years after the enactment of the statute carry even less weight.

ment for maternity clothing from the adopting parents to the natural mother on the theory that the natural mother "render[ed] [a] service in connection with the placement of an individual for adoption."

Judge Rodowsky has authorized me to state that he concurs with the views expressed herein.