745 A.2d 1119

**Larry DORSEY, Individually, et al.**

v.

**Jeffrey NOLD, D.O., et al.**

**No. 1461, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Feb. 10, 2000.

238

Matt R. Ballenger (T. Christine Pham and Suder & Suder, P.A., on the brief), Baltimore, for appellants.

Roy L. Mason (Heather McCabe and Mason, Ketterman & Morgan, on the brief), Annapolis, for appellees.

Argued before MURPHY, C.J., and WENNER and EDWARD J. ANGELETTI, (Specially Assigned), JJ.

MURPHY, Chief Judge.

In this appeal from the Circuit Court for Anne Arundel County, the appellants are the parents and the estate of Candace Dorsey (hereinafter "the Dorseys"), who died on December 14, 1993. The appellees are Candace's pediatrician,

Dr. Jeffrey Nold, and his employer, Anne Arundel Medical Center a/k/a Anne Arundel General Hospital d/b/a Pediatric Medical Center of Annapolis. Following Candace's death, the Dorseys filed suit against the appellees, contending that Candace died of asphyxiation caused by two cancerous thyroid tumors that were pressing against her airway, and that she would not have died if Dr. Nold recognized the severity of her condition and recommended immediate action when he examined Candace three days earlier. A jury ultimately determined that Dr. Nold did not breach the applicable standard of care in his treatment of Candace.

The Dorseys argue, in essence, that:

I. The trial court (i) erred in determining that the Dorseys committed a discovery violation by failing to inform the appellees until six days prior to trial that they intended to call the medical examiner who performed the autopsy on Candace's body, and (ii) abused its discretion in precluding the medical examiner's testimony in the Dorseys' case-in-chief as a sanction for the violation,

II. The trial court erred by refusing to permit the Dorseys to call the medical examiner to the stand to present rebuttal evidence, and

III. The trial court abused its discretion by refusing to permit the Dorseys to present evidence that, shortly before Candace's death, Dr. Nold failed the examination for board certification in pediatrics.

For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTUAL BACKGROUND

Candace visited Dr. Nold at his office on December 11, 1993, complaining that she had been coughing for about a week and had been suffering from a sore throat, hoarseness, and congestion for two days. During his examination of Candace, Dr. Nold observed that she had a "large thyroid goiter [approximately] six centimeters" in size which, Candace told him, had

been there for years.[1]   Dr. Nold gave Candace a "rapid strept test," which proved negative for streptococcus bacteria, then diagnosed her as having an upper respiratory infection, or cold.   He directed her to have blood work done the following Monday, December 13, 1993, to ensure that her thyroid was functioning properly.

Candace went to school on Monday, then had the blood work done after school.   She continued to cough, and that evening complained that she was still not feeling well.   During the following night, Candace's family awoke to hear her gasping for breath.   They found her on the floor of the hallway outside her bedroom, unable to speak.   Candace's father called 911.   When paramedics arrived they immediately gave her oxygen, but as they placed her in the ambulance she went into cardiac arrest.   Resuscitation efforts of the paramedics were unsuccessful, however, as were resuscitation efforts made upon Candace's arrival at the hospital.

Dr. Theodore King, an assistant medical examiner in the Office of the Chief Medical Examiner of the State of Maryland, performed an autopsy on Candace's body.   According to his autopsy report, Dr. King found that "[t]wo discreet, encapsulated masses were present in front of the trachea just beneath the inferior lobes of the thyroid gland.   The higher mass measured 3" by 2" by 3", while the lower mass, 1/2" subjacent, measured 3" by 2" [by] 1–1/2" and extended down over the right atrium of the heart."   Dr. King noted: "Neither of these masses involved the adjacent trachea or the right atrium of the heart, but the masses did narrow and compress the adjacent airway."   He concluded that Candace "died of asphyxia (choking) secondary to airway compression.   The airway compression was caused by an infiltrating carcinoma of the thyroid which arose in the neck of the deceased and compressed her airway."

---

1.   A "goiter" is "an enlargement of the thyroid gland that is commonly visible as a swelling of the anterior part of the neck...."   *Webster's Third New International Dictionary* 974 (1981).

## PROCEDURAL HISTORY

Trial was scheduled to begin on June 16, 1998. Prior to trial, and after consultation with counsel, the court prepared a "Case Management/Scheduling Order." That order provided, in pertinent part:

> *Discovery Cutoff* : All discovery procedures including but not limited to depositions and Answers to Interrogatories shall be concluded not later than April 30, 1998, ("the discovery cutoff date").

> By October 20, 1997, Plaintiffs shall furnish, and by January 1, 1998, Defendants shall furnish, to opposing counsel, the names and addresses of all expert witnesses and such other information regarding expert witnesses as is required by the Maryland Rules of Procedure, Section 2–402(e)(1).

Although appellees timely furnished a list of expert witnesses to the Dorseys, they did not provide the Dorseys with the substance of the expert opinions. The Dorseys did not depose at least one of the defense witnesses, Dr. Grover Hutchins, until May 4, 1998, four days after the discovery cutoff date.[2] Two hours before that deposition took place, counsel for the Dorseys was informed by counsel for appellees that Dr. Hutchins believed that Candace's asphyxiation was caused by an asthma attack and not compression of her airway. Dr. Hutchins confirmed this belief during the deposition. More than a month later, on June 10, 1998, counsel for the Dorseys faxed appellees a letter, informing them that, "in light of the deposition testimony of Dr. Hutchins, Plaintiffs may call Dr. Theodore King to testify at trial."

On June 15, appellees moved *in limine* to bar the Dorseys from calling Dr. King in their case-in-chief. The motion was argued just before trial on June 16. Counsel for appellees acknowledged that he was aware that the Dorseys planned to

---

**2.** Counsel for the Dorseys did not file answers to the defendants' interrogatories until May 12, 1998, 12 days after the discovery cutoff date. Those answers made no mention of counsel's intention to call Dr. King as a fact witness or as an expert witness.

introduce into evidence the autopsy report prepared by Dr. King, and stated that the appellees did not oppose the introduction of the report. He nevertheless argued: "[T]his is certainly trial by surprise to drop an expert witness on us a few days before trial." He also contended that he did not have sufficient time to depose Dr. King subsequent to the disclosure, and pointed out: "[I]t violates the Court's deadlines, and it would be extremely prejudicial for us to have to gear up now to try to defend whatever the testimony is going to be from Dr. King at this point as an expert witness."

Counsel for the Dorseys countered that Dr. King was "a fact witness" rather than "some expert that they had to get me to cooperate in a deposition." He pointed out that, because Dr. King had performed the autopsy, appellees had known of his existence all along and had even met with him several times. The Dorseys, on the other hand, did not know until just before they deposed Dr. Hutchins that appellees planned to challenge Dr. King's findings. Counsel for the Dorseys argued:

> This doctor [ (Dr. King) ] is being called to testify concerning his autopsy report, which the Defense has a copy of. I am not calling him to offer anything else other than what is in his autopsy report.

> And I think it is incumbent upon me to do that when I just recently found out that the Defense has got an expert that is going to say that he—this man is wrong.

Except to say that "the first opportunity I had to speak with Dr. King [after deposing Dr. Hutchins] was June 5th," counsel for the Dorseys did not explain why he waited until June 10 to disclose his intent to call Dr. King.

After hearing argument, the court granted appellees' motion *in limine*. The court explained:

> The question is whether it is unfair [to allow Dr. King to testify]. If we allow Dr. King to testify, then should we postpone the case and allow time for further depositions to be taken prior to his testimony? Should we allow the defense to call further experts in light of Dr. King's testimo-

ny?  We obviously can't do it, and it puts all the parties in an awkward position.  It certainly puts the defense in an unfair position.

It is prejudicial to the defense in that at the last moment, they are confronted with a witness they have not had the opportunity to depose and with no experts to counter whatever his testimony might be.  I agree with [counsel for appellees] in his suggestion that this is a serious infraction of the discovery rules. . . .

. . .

The report speaks for itself if he is to be called as a fact witness which is as near as he comes, then the Court is concerned that he might get into the mechanics of the autopsy, which certainly would be prejudicial to the defense. I think with the report in evidence, as agreed with the parties' understanding it would be in evidence, that what occurred here could well have been expected.  And if there is any fault, it clearly lies by not taking an earlier deposition [of Dr. Hutchins] in the five months or so prior to trial.

The Dorseys then moved for a postponement so that further discovery could be had, or for a mistrial based on the *in limine* ruling.  The court denied those motions, stating: "[W]e've had this set for trial . . . a couple of years."  It added: "We have to weigh the great cost of bringing the litigants here and empaneling a jury, . . . [when] we know . . . from the proffer from the Plaintiff that [Dr. King's] testimony would be consistent and . . . not different from the report that all counsel and parties have been exposed to."  The case proceeded to trial, verdict, and judgment in favor of appellees. This appeal followed.

## I

The Dorseys argue that they did not commit a discovery violation.  This argument, however, assumes that Md. Rule 2–402(e) is the only vehicle for obtaining discovery of expert

evidence in civil cases.   Rule 2–402(e) provides, in pertinent part:

> *Trial preparation—Experts.*   (1) Expected to be called at trial.   Discovery of findings and opinions of experts, otherwise discoverable under the provisions of section (a) of this Rule[3] *and acquired or developed in anticipation of litigation or for trial,* may be obtained without the showing required under section (c)[4] of this Rule only as follows: (A) A party by interrogatories may require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and to produce any written report made by the expert concerning those findings and opinions; (B) a party may obtain further discovery, by deposition or otherwise, of the findings and opinions to which an expert is expected to testify at trial, including any written reports made by the expert concerning those findings and opinions.

---

**3.**  Subsection (a) provides:

> *Generally.* A party may obtain discovery regarding any matter, not privileged, including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identify and location of persons having knowledge of any discoverable matter, if the matter sought is relevant to the subject matter involved in the action, whether it relates to the claim or defense of the party seeking discovery or to the claim or the defense of any other party.  It is not ground for objection that the information sought is already known to or otherwise obtainable by the party seeking discovery or that the information will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.   An interrogatory or deposition question otherwise proper is not objectionable merely because the response involves an opinion or contention that relates to fact or the application of law to fact.

**4.**  Subsection (c) requires a party seeking discovery of documents or other things that the opposing party has prepared in anticipation of litigation to make a showing that the materials are discoverable under subsection (a) and that the party seeking discovery has a substantial need for the materials and cannot obtain them by other means without undue hardship.

. . .

(Emphasis added.) The Dorseys reason that, because Dr. King was an assistant medical examiner who was not hired by them to perform the autopsy, and who did not perform the autopsy in anticipation of litigation or trial, he was not the type of expert witness contemplated by Rule 2–402(e), they were not required to identify him as an expert witness. The Dorseys argue in the alternative that the trial court abused its discretion in barring Dr. King's testimony as a sanction for the discovery violation.[5]

■ The circuit court was not clearly erroneous in finding that at least some of Dr. King's anticipated testimony would have been acquired or developed in anticipation of litigation. Although counsel for the Dorseys assured the trial court that Dr. King would be called to testify solely about the autopsy report and nothing else, the Dorseys' brief asserts that, if called to testify, Dr. King would have been able to "explain, clarify, *and expand on* the information written in the autopsy report." (Emphasis added.) They add that "[i]t was essential to the Dorseys' case that Dr. King be allowed to testify there was no evidence on autopsy to support the defense that Candace died from an asthma attack." Clearly, the Dorseys intended to elicit extensive testimony from Dr. King regarding asthma as well as the lack of evidence of an asthma attack uncovered during Candace's autopsy, a subject that did not necessarily factor into the autopsy report. It is more likely so than not so that such evidence was "acquired or developed" by

---

5. Appellees argue that even if this argument has merit, we would have to conclude that any error on the part of the trial court was harmless. That is because, in the appellees' view, the argument goes to whether Dr. Nold's actions caused Candace's death. Appellees contend that the jury never reached that issue, as the verdict sheet reflects that the jury found for appellees after determining that Dr. Nold did not breach the standard of care he owed Candace. We not persuaded, however, that a tacit belief that Dr. Nold's actions did not cause Candace's death could have influenced the jury's determination that Dr. Nold did not breach the applicable standard of care. We therefore cannot agree that the erroneous exclusion of causation evidence was necessarily harmless error.

Dr. King "in anticipation of litigation or trial," thereby rendering Dr. King the type of expert witness contemplated by Rule 2–402(e). *See, e.g., Patel v. Gayes,* 984 F.2d 214, 217–18 (7th Cir.1993) (interpreting the pre–1993 version of Federal Rule of Civil Procedure 26(b)(4)(A), on which Rule 2–402(e)(1) is based, and upholding a trial court's exclusion of the expert testimony of treating physicians who were not identified as experts during discovery but who would have been asked to testify on matters beyond their treatment of the plaintiff).

■    Moreover, even if Dr. King was not the type of expert witness contemplated by Rule 2–402(e), he was clearly an expert witness as the term is generally understood.    By definition, an expert witness is

> [o]ne who by reason of education or specialized experience possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or deducing correct conclusions. . . .    A witness who has been qualified as an expert and who thereby will be allowed (through his/her answers to questions posted) to assist the jury in understanding complicated and technical subjects not within the understanding of the average lay person. . . .

*Black's Law Dictionary* 578 (6th ed.1991).    Medical examiners are routinely qualified as expert witnesses by Maryland courts.[6]    Although their counsel argued below that Dr. King would be a mere fact witness, the Dorseys tacitly concede in their brief that Dr. King would have been an expert witness. They concede that they "would have had to qualify him as a witness" had they been permitted to call him to the stand, and would have questioned him "as to his education, knowledge,

---

6.  *See, e.g., Wiggins v. State,* 352 Md. 580, 724 A.2d 1 (1999); *Sippio v. State,* 350 Md. 633, 714 A.2d 864 (1998); *Massie v. State,* 349 Md. 834, 709 A.2d 1316 (1998); *Schlossman v. State,* 105 Md.App. 277, 659 A.2d 371 (1995); *Terry v. State,* 34 Md.App. 99, 366 A.2d 65 (1976); *Fabritz v. State,* 30 Md.App. 1, 351 A.2d 477, *cert. denied,* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976); *Quinn Freight Lines, Inc. v. Woods,* 13 Md.App. 346, 283 A.2d 624 (1971), *aff'd,* 266 Md. 381, 292 A.2d 669 (1972); *Long v. State,* 7 Md.App. 256, 254 A.2d 707 (1969).

skill and experience in pathology and performing autopsies." The Dorseys suggest that the jurors might have placed more stock in the autopsy report if they had been aware of Dr. King's qualifications. Of course, only an expert must be qualified before he or she can testify as a witness. *See* Md. Rule 5–702.

The argument that Dr. King was not the type of expert witness contemplated by Rule 2–402(e) ignores the fact that discovery in this case was conducted pursuant to the trial court's "Case Management/Scheduling Order." As this Court has explained,

> The pre-trial order is an extremely important tool in managing the docket and trials. The pre-trial order codifies the decisions made at the pre-trial conference concerning the facts to be relied on in support of claims; the issues that will be raised; stipulated facts; damages claimed and relief sought; documents and records to be offered into evidence at trial; names and specialties of expert witnesses who will be called, *see* Rule 2–504; and ... a time schedule for various pre-trial notifications and submissions.

*Eagle–Picher Indus., Inc. v. Balbos,* 84 Md.App. 10, 25, 578 A.2d 228 (1990), *aff'd in part, rev'd in part on other grounds,* 326 Md. 179, 604 A.2d 445 (1992). *See generally Naughton v. Bankier,* 114 Md.App. 641, 653, 691 A.2d 712 (1997) (vacating and remanding a case where the trial court had permitted an expert witness for the defense to testify even though the defendant violated the scheduling order by failing to identify the witness until one day before trial, and commenting: "If scheduling orders are to be permitted to be treated in such a casual fashion, why bother with them?").

The Dorseys do not contend that the scheduling order was in any way improper. The prefatory sentence to Rule 2–402 reads: *"Unless otherwise limited by order of the court in accordance with these rules,* the scope of discovery is as follows:...." In turn, Md. Rule 2–504(a) requires trial courts to "enter a scheduling order in every civil action" unless the County Administrative Judge orders otherwise. Rule 2–

504(b) lists the required contents of a scheduling order, which include "one or more dates by which each party shall identify each person whom the party expects to call as an expert witness at trial, *including* all information specified in Rule 2–402(e)(1)(A)." Md. Rule 2–504(b)(1)(B) (emphasis added.) In stating that "each party shall identify each person whom the party expects to call as an expert witness," Rule 2–504(b)(1)(B) does not distinguish expert witnesses whose opinions are acquired or developed in anticipation of litigation or trial from other expert witnesses. It simply states that, in addition to identifying each expert witness that they expect to call, parties must supply any information required by Rule 2–402(e)(1)(A), such as reports by and summaries of the opinions of those experts whose opinions are acquired or developed in anticipation of litigation or trial.

The pertinent provision in the trial court's "Case Management/Scheduling Order" was clearly fashioned after Rule 2–504(b)(1)(B), and expressly directed that, by specified dates, each party was to "furnish, to opposing counsel, the names and addresses of all expert witnesses and such other information regarding expert witnesses as is required by the Maryland Rules of Procedure, Section 2–402(e)(1)." Like Rule 2–504(b)(1)(B), the order contemplated the timely furnishing of (i) the names and addresses of all expert witnesses, and (ii) such other information regarding those experts as might be required by Rule 2–402(e)(1). The order cannot be read to require only the disclosure of that information contemplated by Rule 2–402(e)(1), as such a reading would be inconsistent with the plain language of Rule 2–504(b)(1)(B), on which the order was required to be based, and would render meaningless the language of the order itself, that each party furnish "the names and addresses of *all* expert witnesses." (Emphasis added.)

We thus conclude that the Dorseys' failure to reveal until six days before trial that they planned to call Dr. King to the stand was a clear violation of the "Case Management/Scheduling Order," as well as a violation of Rule 2–

402(a). The transcript of the *in limine* hearing shows that appellees requested the identities of all of the Dorseys' witnesses, and that the Dorseys failed timely to identify Dr. King as any type of witness at all. There is no dispute that Dr. King was a "person[ ] having knowledge of [a] discoverable matter," which was "relevant to the subject matter involved in the action." As we have explained, moreover, Rule 2-504(b)(1)(B) makes clear that a party to an action is entitled to learn the identities of *all* expert witnesses to be called by the opposing party. It follows that, upon a proper request under Rule 2-402(a), a party must disclose not only the identifies of those persons having knowledge of any discoverable matter but must also reveal which of those persons will be called as expert witnesses.

It is well-established that

[t]he current Maryland discovery rules are premised on a philosophy encouraging liberal disclosure.... Indeed, the State's discovery rules are deliberately designed to be broad, comprehensive in scope and liberally construed. In *Kelch v. Mass Transit Adm.,* 287 Md. 223, 411 A.2d 449 (1980), this Court stated:

"[A]mong the basic objectives in providing for discovery is 'to require disclosure of facts by a party litigant to all of his adversaries, and thereby to eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind concerning the facts that give rise to the litigation.' ... Further, '[i]n order to accomplish the above purposes, the discovery rules are to be liberally construed.' ... "

. . .

The main purposes to be served by allowing pretrial discovery of documents are "(i) to acquire accurate and useful information with respect to testimony which is likely to be presented by an opponent, (ii) to obtain information which appears reasonably calculated to lead to the discovery of admissible evidence, and (iii) to use as an aid in cross-examining the opponent's witnesses."

*E.I. duPont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 405, 718 A.2d 1129 (1998) (citations omitted).

The primary case on which the Dorseys rely, *Harasimowicz v. McAllister,* 78 F.R.D. 319 (E.D.Pa.1978), was decided under the pre–1993 version of Federal Rule of Civil Procedure 26(b)(4), on which Md. Rule 2–402(e) is based.[7] *See Turgut v. Levine,* 79 Md.App. 279, 289, 556 A.2d 720 (1989) (because Rule 2–402(e) was modeled on the pre–1993 version of F.R.C.P. 26(b)(4), "we look to the federal decisions construing that rule for guidance on the proper interpretation of the language employed"). In *Harasimowicz* the estate of a man killed by police officers brought a civil rights action against the officers. When the plaintiff estate sought to depose the medical examiner who performed the autopsy on the decedent, the medical examiner moved for a protective order. The court denied the request, explaining that the medical examiner did not fall within the protections of F.R.C.P. 26(b)(4)(A), in that he did not acquire or develop his opinion in anticipation of litigation or trial. *See* 78 F.R.D. at 320. *Harasimowicz* does not stand for the proposition that a party need not disclose the identity of those expert witnesses whose opinions were not acquired or developed in anticipation of litigation or trial.[8] Nothing in that case persuades us that section (e) of Rule 2–

---

**7.** The former version of the federal rule disallowed the taking of depositions of experts whose opinions were "acquired or developed in anticipation of litigation or trial" unless the party seeking the deposition convinced the court, upon a proper motion, that the deposition was necessary. *See* former F.R.C.P. 26(b)(4)(A)(i) and (ii). Like Md. Rule 2–402(e)(1)(B), current F.R.C.P. 26(b)(4)(A) allows, as a matter of course, the taking of the deposition of an expert witness who is expected to be called to testify at trial.

**8.** The amendment to F.R.C.P. 26, which took effect December 1, 1993, added an express requirement that parties disclose their expert witnesses prior to trial. *See* F.R.C.P. 26(a)(2)(A) ("... a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence"). The Advisory Committee Note regarding the added requirement states:

402 allows parties to withhold from their opponents information regarding expert witnesses that would otherwise be discoverable under section (a).

The Dorseys also rely on this Court's decision in *Turgut*, 79 Md.App. 279, 556 A.2d 720. In *Turgut*, the plaintiff in a medical malpractice action moved to preclude the defendant obstetrician from testifying, as an expert witness, as to why he chose to use a particular suturing technique to repair a fissure that the plaintiff suffered during childbirth. The plaintiff argued that the defendant should not be permitted to testify as an expert witness because he had not been identified as such prior to trial. The trial court granted the plaintiff's motion, but this Court reversed. Relying on *Harasimowicz*, we explained that the defendant's "opinion as to why he selected the suturing technique which he employed on appellee was not one which was acquired or developed in anticipation of litigation or for trial. Hence, [the defendant] was not required to list himself as an expert who was expected to be called as a witness at trial in response to appellee's Rule 2–402(e)(1) interrogatory." 79 Md.App. at 290, 556 A.2d 720.

In *Turgut*, however, we did not address the issue of whether the defendant could have been required to identify himself as an expert pursuant to some authority other than Rule 2–

---

This paragraph imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses. Normally, the court should prescribe a time for these disclosures in a scheduling order under Rule 16(b), and in most cases the party with the burden of proof on an issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue.

*Cf.* F.R.C.P 26(a)(3)(also added by the 1993 amendment and providing: "... a party shall provide to other parties the following information regarding evidence that it may present at trial other than solely for impeachment purposes: (A) the name and, if not previously provided, the address and telephone number of each witness, separately identifying those whom the party expects to present and those whom the party may call if the need arises ..."). Thus, it appears that the federal practice now parallels the Maryland practice outlined in Md. Rules 2–402 and 2–504.

402(e). Moreover, *Turgut* was decided before the 1994 adoption of the present version of Rule 2–504, which expressly requires (1) that scheduling orders be issued in civil cases, and (2) that such orders include time frames for disclosing the identities of expert witnesses.

It is true that we did note in *Turgut* that the defendant had not acquired or developed his opinion in anticipation of litigation or trial. In that case, however, (1) the suturing technique employed by the defendant was a key issue, (2) there is no suggestion that the plaintiff was unable to depose the defendant regarding the suturing technique or any other pertinent matter; and (3) the plaintiff was presumably aware of the anticipated contents of the defendant's testimony. If a physician who has been sued for medical malpractice is the type of expert witness contemplated by section (e) of the Rule, pursuant to Rule 2–402(e)(3), the physician would be entitled to fees and expenses for deposition testimony.

It is also true that courts in several jurisdictions have held that a party could not be precluded from calling an expert witness at trial, even though the party failed timely to disclose during discovery that the person would be called as an expert witness, where the witness's opinion was not acquired or developed in anticipation of trial. *See Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525 (1995); *Tzystuck v. Chicago Transit Authority,* 124 Ill.2d 226, 124 Ill.Dec. 544, 529 N.E.2d 525 (1988); *Austin v. Kaufman,* 203 Ga.App. 704, 417 S.E.2d 660 (1992); *Adkins v. Morton,* 494 A.2d 652 (D.C.App. 1985). Those cases, however, are based on the pre–1993 version of F.R.C.P. 26(b)(4) or a State discovery rule modeled thereon, and are readily distinguishable from the instant case in that the parties seeking to preclude the expert testimony had received timely notice that the witnesses would be called in some capacity.[9] In the instant case, while appellees were aware that the autopsy report would be offered into evidence,

---

9. In *Miller,* 664 A.2d at 529–32, the Supreme Court of Pennsylvania held that a trial court erred by precluding the expert testimony of a coroner as to the time of death of the plaintiff's decedent. Significant-

they were not informed until six days before trial that Dr. King would be called to testify in any capacity.

More analogous to the case at bar is *Chakales v. Hertz. Corp.*, 152 F.R.D. 240 (N.D.Ga.1993), a personal injury case in which the defendants submitted interrogatories to the plaintiffs requesting the names and addresses of all of the plaintiffs' expert witnesses. The list supplied by the plaintiffs did not include the names and addresses of certain treating physicians, although the plaintiffs did identify the physicians as fact witnesses. Shortly before trial, the plaintiffs sought to clarify that the physicians would be called as expert witnesses, the defendants objected, and the United States District Court for

---

ly, even though the plaintiff had failed to disclose during discovery that the coroner would be called as an expert witness and had failed to disclose the contents of his testimony, the plaintiff had revealed that the coroner would be a fact witness.

In *Tzystuck*, 124 Ill.Dec. 544, 529 N.E.2d at 528–30, the Supreme Court of Illinois held that the plaintiff in a personal injury suit was not required to list a treating physician as an expert witness, and that the trial court therefore properly permitted the physician's testimony. The court pointed out that the treating physician had not been retained by the plaintiff to render an opinion at trial. It added, however, that the defendants were in no way prejudiced by the plaintiff's failure to list the physician as an expert witness, in that the plaintiff had informed the defendants more than a year before trial that the physician would be called as a witness, the defendants had procured copies of the physician's records and had deposed him, and the record made clear that the physician had testified from his own observations and recollections and not based on outside materials.

In *Austin*, 417 S.E.2d at 665, the Court of Appeals of Georgia upheld a trial court's decision to permit a medical examiner to testify as an expert witness even though the plaintiff failed to disclose during discovery that the medical examiner would be called. The court pointed out that the medical examiner did not acquire or develop his opinion in anticipation of litigation or trial, but further observed that the medical examiner *had* been identified as an expert witness in the pre-trial order.

Finally, in *Adkins*, 494 A.2d at 656–59, the District of Columbia Court of Appeals held that a treating physician could testify as a expert witness for the defense even though he was not specifically named by the defense in discovery as an expert witness. The court noted that the physician did not acquire his opinion in anticipation of litigation and, in any event, the defense had specifically informed the plaintiffs that it reserved the right to call all treating physicians. Further, the defense had identified the expert witness in its pretrial statement, which was adopted by the court as part of its pretrial order.

the Northern District of Georgia, Atlanta Division, agreed with the defendants that the plaintiffs had committed a discovery violation.[10] The court rejected the plaintiffs' argument that under *Harasimowicz* the treating physicians were not expert witnesses. It distinguished *Harasimowicz* and other authorities cited by the plaintiffs on the ground that those authorities "deal with certain expert witnesses' entitlement to protective orders precluding intrusive discovery by opposing counsel when those experts are retained in anticipation of litigation. The authorities cited by plaintiffs merely indicate that experts who are not retained in anticipation of litigation are not entitled to these protections." 152 F.R.D. at 242.

Significantly, *Chakales* was decided nearly two months prior to the 1993 amendment of F.R.C.P. 26(b)(4). At that time, the federal rule, like Maryland's current rule, did not expressly require parties to disclose the names of expert witnesses to be called at trial. The local rules of the United States District Court for the Northern District of Georgia did, however, include such an express requirement. *See* Local Rule 225–1(c), Northern District, Georgia. In our view, the relationship between F.R.C.P. 26(b)(4) and Local Rule 225–1(c) is analogous to the relationship between Md. Rule 2–402(e) and Md. Rule 2–504(b), which addresses the required disclosure of expert witnesses pursuant to scheduling orders.

In holding that the plaintiffs had committed a discovery violation, the *Chakales* court pointed out that "Rule 702 of the Federal Rules of Evidence describes an expert as one who has 'scientific, technical, or other specialized knowledge [which] will assist the trier of fact to understand the evidence or to determine a fact in issue.'" 152 F.R.D. at 245. It explained:

> [This] Court concludes that the treating physicians at issue are "experts" pursuant to the applicable rule of evi-

---

**10.** As a sanction for the violation, the court initially ruled that the plaintiffs could not present the testimony of the treating physicians. Upon the plaintiffs' motion for reconsideration, the court determined that that sanction was "overly harsh" and instead re-opened the discovery period and ordered the plaintiffs to pay certain discovery costs incurred by the defendants. 152 F.R.D. at 246.

dence and that Rule 26(b)(4) does not alter in any way the definition of "expert" for purposes of discovery. Indeed, even without an examination of case law, the clear language of the rule is at odds with plaintiffs argument that it limits the definition of an expert to one whose opinion was acquired or developed in anticipation of litigation. That is, Rule 26(b)(4) addresses discovery of the opinions of experts that are "otherwise discoverable" *and* that were "acquired or developed in anticipation of litigation." (emphasis added). By its own terms, the rule envisions the existence of experts whose opinions were not acquired or developed in anticipation of litigation.

152 F.R.D. at 245.

In *Lee v. Knutson*, 112 F.R.D. 105 (N.D.Miss.1986), also decided prior to the 1993 amendment of F.R.C.P. 26, the United States District Court for the Northern District of Mississippi, Greenville Division, granted a defendant's request that the court preclude the plaintiff from calling certain treating physicians as expert witnesses in a medical malpractice action. The court observed that, although the plaintiff had identified the treating physicians during the discovery process as persons having knowledge of the case, he had not timely listed them as expert witnesses. In response to the plaintiff's argument that treating physicians are not expert witnesses within the meaning of former F.R.C.P. 26(b)(4) because their opinions are not developed or acquired in anticipation of litigation or trial, the court stated:

> There is ample authority for the proposition that an expert witness, such as a treating physician, whose entire testimony will be based upon his own examination and treatment of a party, is not subject to the provisions of Rule 26(b)(4). Such a non–26(b)(4) expert is subject to discovery without the limitations imposed by Rule 26(b)(4)....

> . . .

Plaintiffs have failed to cite, and the court's own extensive research has failed to reveal, any reported decision or any

scholarly writing in which it has been held or suggested that a party cannot be called upon by interrogatory to identify his non–26(b)(4) trial experts and state the facts and opinions expected to be testified to by them, as well as the bases for their opinions. It logically could not be so. There is simply no reason to hold that non–26(b)(4) trial experts may not be discovered by way of the same interrogatories as 26(b)(4) trial experts. This result flows from precedent as well as logic and common sense.

112 F.R.D. at 108.

■■■■ "In administering the discovery rules, trial judges ' "are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of a showing of abuse." ' " *E.I. duPont de Nemours & Co.*, 351 Md. at 405, 718 A.2d 1129 (citations omitted). In determining whether an abuse of discretion has occurred, we look to:

"(1) whether the disclosure violation was technical or substantial;

(2) the timing of the ultimate disclosure;

(3) the reason, if any, for the violation;

(4) the degree of prejudice to the parties respectively offering and opposing the evidence; and

(5) whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance."

*Balbos*, 84 Md.App. at 28, 578 A.2d 228 (citation omitted) (affirming a trial court's decision to preclude the testimony of an expert witness whose name was not disclosed in the final pre-trial order due to a typographical error, even though the name had been included in an earlier version of the order).

■■■ The record before us establishes that the trial court gave ample attention to all pertinent considerations. To recount, the court expressly considered that the scheduling order commanded the Dorseys to reveal their expert witnesses to appellees by October 20, 1997. Appellees informed the Dorseys of the identities of their expert witnesses by

December 30, 1997, within the time frame established by the scheduling order. Although appellees failed to apprize the Dorseys of the substance of the opinions of appellee' experts, the Dorseys waited until four days after the discovery cutoff date to depose defense expert Dr. Hutchins, and thereafter waited until six days before trial to inform appellees that they intended to call Dr. King. The trial court expressly accepted appellees' contention that, at that point, they did not have sufficient time to depose Dr. King. *See, e.g., Commercial Union Ins. Co. v. Porter Hayden Co.,* 116 Md.App. 605, 638–42, 698 A.2d 1167 (affirming trial court's refusal to permit party in complex asbestos case to call expert witness that it failed to identify until two weeks before trial), *cert. denied,* 348 Md. 205, 703 A.2d 147 (1997).

It is true that appellees were aware of Dr. King's existence, had previously spoken with him, and could have deposed him had they so desired. The circuit court was required to consider that fact, but was not required to find it dispositive. As the United States District Court for the Northern District of Mississippi commented in *Lee,* 112 F.R.D. at 110:

> [d]efense counsel had no reason to prepare to cross examine these particular witnesses until he had reason to believe they would be called as trial witnesses. He attempted to inform himself on that subject and was prevented from doing so by plaintiffs' failure to fully respond to his discovery requests. It is no answer to say that defense counsel could have deposed the witnesses himself.... It is for defense counsel, and not plaintiffs, to choose the methods of discovery which he will employ, so long as the choice is not foreclosed by the Rules.

(Citation omitted.) The circuit court noted that the trial date had been set for "years" and could not be rescheduled without great expense and inconvenience. Finally, it observed that, regardless of whether Dr. King testified, the autopsy report would be before the jury. Under the circumstances, even though it would not have been an abuse of discretion to permit Dr. King's testimony, we are unable to declare that the

decision to exclude his testimony constituted an unfairly prejudicial abuse of discretion.

## II

In opposing appellees' motion *in limine* to bar Dr. King's testimony, counsel for the Dorseys asserted that, even if the court granted the motion and refused to permit Dr. King to testify in the plaintiffs' case-in-chief, they could "clearly call him as a rebuttal witness." At the conclusion of the defense's case, the Dorseys again sought to call Dr. King to the stand, this time as a rebuttal witness. The trial court refused, explaining that allowing Dr. King to testify in rebuttal would "be contrary to [the] earlier ruling" regarding the discovery violation. The court further determined that the proffered testimony by Dr. King would not constitute proper rebuttal testimony in any event.

The Dorseys argue that, even if the trial court properly precluded Dr. King's testimony in their case-in-chief, it erred by refusing to permit them to call the doctor in rebuttal. The Dorseys point out that an expert witness for the defense, Dr. Grover Hutchins, relied heavily on pathology slides that were made during the autopsy in support of his opinion that Candace choked to death during an asthma attack. The slides were not mentioned in the autopsy report and were not discussed by any of the plaintiffs' witnesses. The Dorseys contend that, because they could not have known until Dr. Hutchins actually testified that he would rely on the slides to support his opinion, Dr. Hutchins's testimony regarding the slides was "new evidence" that they were entitled to rebut.

"The general rule, of long standing in Maryland, is that 'the plaintiff ... must put in the whole of his evidence, upon every point or issue which he opens, before the defendant proceeds with the evidence on his part.'" *Wright v. State,* 349 Md. 334, 341, 708 A.2d 316 (1998) (quoting *Maurice v. Worden,* 54 Md. 233, 251 (1880)). As this Court has explained: "A *prima facie* case of medical negligence must establish (1) the applicable standard of care, (2) that this

standard of care has been violated, and (3) that this violation caused the harm complained of." *Karl v. Davis*, 100 Md.App. 42, 51, 639 A.2d 214, *cert. denied*, 335 Md. 224, 642 A.2d 1356 (1994). The Dorseys were obviously required to establish the cause of Candace's death in their case-in-chief. Less obvious, of course, is the issue of whether the Dorseys were also required to present in their case-in-chief **all** of their evidence tending to discredit the contention that Candace suffered an asthma attack.

■ At the point when the Dorseys began to present evidence, they were aware of appellees' theory, and they did present *some* "anticipatory rebuttal" evidence during case-in-chief. We are not presented with the question of whether the Dorseys were entitled to introduce evidence that explained, contradicted or directly replied to Dr. Hutchins's testimony that the autopsy slides showed signs of an asthma attack would have been proper rebuttal evidence.[11] The Dorseys made no attempt to offer such evidence during the rebuttal portion of their case through anyone other than Dr. King, and we hold that the trial court properly excluded Dr. King's testimony based on the discovery violation. The trial court's ruling precluding Dr. King from testifying does not fall by the wayside simply because the Dorseys later sought to introduce Dr. King's testimony as rebuttal evidence.

Counsel for the Dorseys mentioned in opening statement that "there is ... no medical evidence, nothing to suggest that asthma was the cause of death." The Dorseys' own expert witness, Dr. James Brownley, was asked on direct examination

---

**11.** *See, e.g., Fairfax Savings, F.S.B. v. Ellerin*, 94 Md.App. 685, 696–700, 619 A.2d 141 (1993) (explaining that a plaintiff may not properly present in rebuttal evidence that is merely cumulative of evidence presented in the plaintiff's case-in-chief), *aff'd in part, vacated in part on other grounds*, 337 Md. 216, 652 A.2d 1117 (1995). *Cf. Fireman's Fund Ins. Co. v. Bragg*, 76 Md.App. 709, 720–21, 548 A.2d 151 (1988) (explaining that a trial court has discretion to permit a plaintiff to present anticipatory rebuttal evidence in its case-in-chief). *See also Wright*, 349 Md. at 341–43, 708 A.2d 316 (defining rebuttal evidence and discussing a trial court's discretion in evaluating such evidence and ruling upon its admissibility)

whether, based on his review of the autopsy report, there was any evidence that Candace suffered an asthma attack. The witness responded that there was not. It is thus abundantly clear that the Dorseys were aware that appellees would present evidence, through Dr. Hutchins, that Candace suffered an asthma attack, and that expert testimony would be necessary to rebut that evidence.[12]

Neither Rule 2–402(a), Rule 2–504(b), nor the scheduling order distinguish between expert testimony to be presented in a party's case-in-chief and expert testimony to be used in rebuttal. In either situation, the party seeking to present the expert testimony must timely disclose the identity of the expert witness as required by the scheduling order or as properly requested in accordance with Rule 2–402(a). *See generally State Roads Comm'n v. 370 Ltd. Partnership,* 325 Md. 96, 106–11, 599 A.2d 449 (1991) (making clear that the discovery requirements, and in particular the disclosure requirements of Rule 2–402(e) regarding expert information, apply to rebuttal witnesses as well as witnesses to be called in a party's case-in-chief). *Cf. Hutchins v. State,* 339 Md. 466, 472–75, 663 A.2d 1281 (1995) (holding that Md. Rule 4–263(b)(4), which concerns discovery in criminal cases and requires the State to "[p]roduce and permit the defendant to inspect and copy all written reports or statements made in connection with the action by each expert consulted by the State," permits defendants to discover information regarding experts consulted for rebuttal); F.R.C.P. 26(a)(2)(C) (setting forth time frames for the disclosure of the identities of expert witnesses, including later-acquired experts whose testimony becomes necessary "solely to contradict or rebut evidence on

---

12. The Dorseys themselves informed the trial court that, upon learning that Dr. Hutchins would be called to dispute Dr. King's findings as to the cause of Candace's death, they determined that they should call Dr. King to the stand. Thus, this was not a situation in which a plaintiff was genuinely surprised by evidence presented during the defendant's case, such that the need for presenting an expert witness in rebuttal could not have been anticipated.

the same subject matter identified by another party [during discovery] …").

## III

Just prior to trial, appellees moved *in limine* to bar the Dorseys from presenting evidence that Dr. Nold failed the examination for board certification in pediatrics shortly before he treated Candace on December 11, 1993. After hearing argument from counsel, the trial court granted the motion *in limine*. The Dorseys now contend that the trial court erred.

According to the Dorseys, even though Dr. Nold was not offered and accepted by the court as an expert witness, he presented expert medical opinions. Evidence that he failed the examination, they argue, would have been relevant as to his qualifications and credibility as a witness. The Dorseys further contend that the evidence would have been relevant as to Dr. Nold's competency to treat patients.

"'Relevant evidence' means evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less than it would be without the evidence." Md. Rule 5–401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403.

> It is well settled that the admission of evidence, including the determination of its relevance, … is committed to the considerable and sound discretion of the trial court.…
> Although a finding of relevancy does not guarantee admissibility, its prejudicial effect sometimes outweighing its probative value, … where such a finding has been made, and the only challenge is to its appropriateness, the trial court's determination in that regard will not be reversed unless …
> there is a clear showing of an abuse of discretion.…

*Smallwood v. Bradford*, 352 Md. 8, 27, 720 A.2d 586 (1998) (citations omitted). Similarly, "[m]atters concerning the na-

ture and scope of cross-examination are within the sound discretion of the trial court. A ruling with reference to them will only be disturbed upon a showing of prejudicial abuse of discretion." *Fleming v. Prince George's County,* 277 Md. 655, 679, 358 A.2d 892 (1976).

The record reflects that Dr. Nold passed the examination and became board certified shortly after he treated Candace. He had been board certified for about four years at the time of trial, and was serving as the Assistant Chief of Pediatrics at the Anne Arundel Medical Center. The trial court determined that the fact that the doctor failed his first attempt to pass the examination had little bearing on his competency or credibility, but might unfairly cast him in a bad light and cause him embarrassment. Under the circumstances, we perceive no abuse of discretion. *See generally Gossard v. Kalra,* 291 Ill.App.3d 180, 225 Ill.Dec. 725, 684 N.E.2d 410 (1997) (trial court did not abuse its discretion by barring evidence of defendant physician's prior failures to obtain board certification where defendant was certified when he treated the plaintiff).

Evidence regarding the applicable standard of care was elicited from expert witnesses other than Dr. Nold.[13] The trial court did not err or abuse its discretion in excluding evidence that Dr. Nold had once failed an examination that he subsequently passed years before trial.

**JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.**

---

**13.** Dr. Nold's only testimony on the matter was elicited by the Dorseys' counsel on direct adverse examination. Counsel asked Dr. Nold if "the standards of care are national standards," and the doctor responded in the affirmative.